## HALL ET AL. *vs.* HALL ET AL.

[BILL IN EQUITY BY WARDS, AGAINST GUARDIANS, FOR DISCOVERY, ACCOUNT, FINAL SETTLEMENT, REMOVAL OF GUARDIAN, AND REFORMATION OF GUARDIAN'S BOND.]

1. *Chancery ; when has jurisdiction to compel guardian to make final settlement, in first instance.*—Where the judge of probate, recently elected, is disqualified for holding office of such probate judgeship, and discharging the same, on account of disabilities incurred by reason of his participation in the late rebellion, chancery will take jurisdiction to compel a guardian, who has failed to make and return any inventory of his ward's estate, as required by law, to account and make settlement for his ward's funds, received by him, as such guardian.

2. *Guardian; duty of.*—A guardian is a trustee appointed by law, and it

is his duty to preserve and improve the ward's estate, and not waste or destroy it.

3. *Same; when will not be excused for investment of wards' money in Confederate bonds or treasury-notes.*—A guardian will not be excused from accounting for his ward's money, which was received by him, in this State, during the year 1861, in specie or current bank notes, and afterwards converted by him, without an order of the proper court, into Confederate treasury notes, or Confederate interest-bearing bonds, and which estate was thereby finally lost and destroyed.

4. *Guardian; duty of, when money cannot be safely loaned.*—It is the guardian's duty to keep his ward's moneys safely, without charge, if he cannot loan them out, or re-invest them, under order of the proper court.

5. *Demurrer; what not good cause of, to bill in chancery.*—An amended bill in chancery is not demurrable, because it combines an application to compel a guardian to make a settlement of his guardianship, with a prayer for reformation of the guardian's bond, which, by mistake, has been made payable to the judge whose term has just expired, instead of to the judge just elected and inducted into office.

6. *Guardian's bond; when will be reformed.*—A guardian's bond, which, by mistake, has been made payable to the judge of probate whose term has just expired, instead of to the judge who has been elected and inducted into office to succeed him, will be reformed so as to make it payable to the proper judge, upon sufficient proof of the mistake.

7. *Same; signatures to, when sufficient.*—It is not necessary that the guardian's bond should be signed by him and his securities at the same time, or on the same day; it is sufficient if all sign it before it is approved.

8. *Act approved November 9th, 1861; what will not excuse guardian from.*— The enactment of the insurrectionary legislature of this State, during the late rebellion, purporting to have been approved November 9th, 1861, is not such an authority as will excuse a guardian who collects his debts due his wards in Confederate treasury-notes, and invests the same in Confederate interest-bearing bonds, from accounting for the debts thus collected, and the funds thus invested, if the same be thereby wholly lost.

9. *Ordinance of secession; effect of.*—The ordinance of secession was a nullity. It did not destroy the rightful State of Alabama, nor repeal its laws.

10. *Insurrectionary government; laws of, how far entitled to recognition in this court as laws.*—The insurrectionary government, which was organized in the State after the act of secession, was illegal; its general assembly was illegal; and its legislative acts were unlawful enactments; and they are not entitled to recognition in this court, as laws, unless it is shown that they have since been re-enacted, or adopted by the legislature of the present rightful government.

THIS was a bill in equity, exhibited in the chancery court of Mobile, by Wm. C. Hall, in his own behalf, and as next friend of Joseph, Eliza and Thompson Hall, minors,

against their guardian, Gerald B. Hall, and Y. C. Hall, his security, praying for account and discovery, reformation of guardian's bonds, final settlement, and removal of guardian, and for general relief.

The bill alleges that on the 25th of May, 1861, Gerald B. Hall was duly appointed, qualified, and gave bond, in the probate court of Mobile county, as guardian of complainants, with Y. C. and Joseph Hall as his securities; that by virtue of his appointment as guardian, &c., said G. B. Hall received from the estate of complainants' father, $9,000 in specie funds, or its equivalent, in which sum complainants had an equal interest; that immediately after receiving said money, said guardian converted it to his own use; that he has never made any inventory, or other return to the probate court, nor made any annual statement, or settlement, as required by law; that said guardian has furnished nothing whatever to the support and education of complainants; that said guardian being called on for a settlement, averred that he invested the money in Confederate securities, and that the same was thereby wholly lost, and denied any liability or claim on him on account of the same; and averred that he was insolvent, and could pay nothing; all of which statement (except the insolvency, which is admitted,) are charged to be false, and made with a view to cover the waste and destruction of complainants' estate.

The bill also alleges that complainants are in great need of said money for their support and education, the war having greatly reduced their relatives, with whom they formerly lived; that the recently elected judge of probate, on account of participation in the rebellion, has not been permitted to take that office, or exercise the duties thereof, and that there is no prospect that he will be permitted to assume the duties of said office, within any reasonable time; that G. B. Hall, the guardian, is insolvent; that Joseph Hall, one of the securities, is dead, and his estate utterly insolvent; that the other surety, Y. C. Hall, has no available property to answer his liability to complainants, except some pine lands in Baldwin county, from which he is rapidly moving and cutting down the timber, the only

thing of value on it, and that without the speedy interposition of the court, said fund would be inevitably lost.

The prayer of the bill is that the court will take jurisdiction of said guardianship, and for the removal of said Hall as guardian, and for account and discovery, and for decree against said Hall and his surety, and for general relief.

The guardian's bond is made an exhibit on the bill; it is in the usual form and penalty, and payable to John A. Hitchcock, judge of the probate court of Mobile county, and his successors in office, and signed by defendants on the 25th day of May, 1861, but was "taken and approved by Geo. W. Bond, Judge," on the 25th May, 1861.

The defendant, Y. C. Hall, answered, denying any liability as surety, because the said John A. Hitchcock, at the making, approving, and delivery of said bond, was not the judge of probate, and that there was no authority of law for taking such a bond; and secondly, because his co-defendant, G. B. Hall, immediately after receiving said funds, placed them in the Bank of Mobile, for the use of said wards, and for safe keeping; that in 1862, his co-defendant being unable to get gold and silver from the bank, took payment for said deposit in Confederate treasury-notes of the (then) value of the funds deposited, and immediately afterwards invested the same in Confederate interest-bearing treasury-notes, under and by virtue of the several acts of the general assembly of the State of Alabama, on the subject; that afterwards said notes were destroyed, with co-defendant's house, in 1865, by fire. There was also a demurrer to the bill for want of equity.

Afterwards, complainants amended the bill so as to allege that Hitchcock, to whom the bond was made payable, had just gone out of office when said bond was made, and that in drawing it up, one of the printed blanks, with Hitchcock's name on it, was used, and the name of Hitchcock omitted to be erased by mistake, and the name of G. W. Bond omitted to be inserted by mistake; that it was the intention of said G. W. Bond, and the obligors on the bond, that the same should be made payable to G. W. Bond, as judge of probate of Mobile county, and not to

John A. Hitchcock, and the prayer was so amended as to ask for the reformation of the bond, &c.

The defendant, Y. C. Hall, filed a sworn answer to the amendment, and denied " any knowledge of any agreement or understanding between G. B. Hall and said G. W. Bond, in taking said bond ; averred that defendant was nothing more than a surety on the paper signed, and nothing was said to him, further than that he was requested to sign the bond, which he did, and which bond defendant charges is void ; and further, that there was no other agreement, contract, or obligation entered into by him, either in writing or on parol."

Defendant also demurred to the amendment—

1. Because it makes a new case, and is a departure.

2. Because it seeks to make defendant liable for the defaults of G. B. Hall, on facts not in writing, and is, therefore, violative of the statute of frauds.

3. Because the original bond, being void, as appears from the bill, to reform it would be to make a new bond, which ought not to be done on the facts charged.

4. Because defendant is a mere security, and the facts charged are not sufficient to reform as to him ; he has a right to stand on, and abide by the original paper signed and agreed to by him, and none other.

5. For want of equity.

The defendant, G. B. Hall, filed a sworn answer, admitting the receipt of eight thousand five hundred and fifty dollars, in bills of the Bank of Mobile ; denies any conversion whatever ; avers deposit in Bank of Mobile for use of his wards, and its being kept there because the condition of the country rendered it unsafe to invest it, until 1862, when he demanded gold and silver of the Bank of Mobile, but could get nothing but Confederate treasury-notes, which were equal to the value of the bills deposited. " Defendant hesitated a long time about what he should do with the money ; and after consulting many friends—good business men—and exercising his own best judgment, defendant was forced by public opinion and his best judgment, to receive said deposit, and to invest the same in interest-bearing Confederate treasury-notes, which

he did some time in 1862; that defendant kept said money separate and apart from his own, and safely under lock and key, until 1865, when the federal forces attacked and burned his house, and destroyed the notes and all the other valuables of defendant."

In answer to amended bill, defendant avers " that he did not read the bond; nothing was said about any mistake as to the form; defendant did not know what kind of a bond the law required; that he knew he had to give bond, and he supposed that the bond handed him to sign was in the usual form. All the parties to said bond signed separately and at different times; defendant did not see either of the other parties sign." Defendant, G. B. Hall, also demurred to the bill for want of equity, and for want of jurisdiction in the court, and to the amendment, for departure.

It was proven by James S. Greene, who was, and had been book-keeper of the Bank of Mobile since 1843, and was such book-keeper in 1861-2-3-4, that Green B. Hall had an individual account with the bank during that time, but none as guardian. Attached, as an exhibit to his answer, is a transcript of G. B. Hall's account from January 10th, 1860, to March 19th, 1864, (when the account was closed), taken from the books of the bank. There is no item of $8,550, either on the debit or credit side of said account. There was a deposit of $9,100 on the 11th June, 1860, and afterwards various deposits of from $500 to $1,000, which Hall checked upon. The balance to the credit of Hall on the 7th day of December, 1861, was $959.42, and the total amount of deposits from that time until March the 14th, 1864, when the account was closed, were $4,748.85.

It was proven by the records of the probate court, and also by the testimony of James Hall, that Gerald B. Hall received from the administrator of the estate of William Hall, deceased, who was the father of the wards, about the sum of $8,820.28.

For the defendants, there was no testimony offered, save their own depositions, which were, in substance, the same as their answers to the original and amended bill.

The cause was submitted for decree, on the original and

amended bills, the answer of the defendants, and the testimony. On final hearing, the chancellor overruled the several demurrers of the defendants, ordered and adjudged that complainants were entitled to the relief prayed for; that the bond made an exhibit to the bill, be reformed according to the prayer of the amended bill; directed the register to take and state an account between complainants and said G. B. Hall, as their guardian, as prayed in the bill, and to have said guardian removed from the guardianship. In the order of reference the register directed him "not to allow any credit for any investment of the funds of said trust estate in notes or bonds of the Confederate States of America."

The defendants appeal, and now assign as error, that the court erred—

1st. In overruling the demurrers to the original bill. 2d. In overruling the demurrers to the amended bill. 3d. In permitting the amendment of the original bill. 4th. In the final decree rendered.

DARGAN & TAYLOR, for appellants.
R. H. SMITH, contra.

[No briefs came into the hands of the reporter.]

PETERS, J.—In courts of chancery, it is upon the allegations of the bill and the answer that the parties are to be relieved or defended. Upon these alone the chancellor predicates his decree. In this case the answer is in the nature of a cross-bill, and asks, in effect, the ratification and approval of the acts of the guardian, by which the estate of his wards has been wholly lost. Then, it should show such a narrative of facts as would have justified the allowance of such ratification, should the same have been set up in a bill for relief, under like circumstances.—Adams' Eq. p. 343, marg.

A guardian is a trustee appointed by law, and his powers are limited by the law prescribing his duties. If he transcends the limits thus imposed in his dealings with the ward's estate, he takes upon himself the responsibilities

incurred by his acts. If they are hurtful to his ward's estate, he must answer for the injury, out of his own pocket, and not impose it upon his ward. The law regulating the ordinary duties of guardians is found in the Code. If there is need to go beyond what is there laid down, he must resort to a court of chancery for advice and direction, if the powers of the court of probate are insufficient to afford the required assistance. He must manage his ward's estate according to law. If he acts without authority of law, he takes the peril upon himself, and must suffer the consequences, if his acts are destructive to the ward's estate. He is appointed, not to destroy the ward's estate, nor to injure it, but to preserve it and improve it.—Revised Code, § 2426, *et seq.;* 2 Kent, 229–231, and notes ; 2 Story's Eq. § 977 ; *Allen v. Martin,* 36 Ala. 330.

Where the law has prescribed rules for the management of the ward's estate, as it has done in this case, neither public opinion nor the advice of friends is sufficient authority to disregard the law. In *West, Oliver & Co. v. Ball & Crommelin,* which was a case in principle quite similar to this, Chief-Justice Collier declares, that "it has been repeatedly decided, that the usage of no class of men can be supported in opposition to established law."—12 Ala. 340, 347. And that case was stronger than this ; because usage is sometimes treated as law, but public opinion and advice of friends never is. Usage has something fixed and regular in its action, and men consent to it as a law ; but public opinion and the advice of friends are as variant as people's faces, and as unstable as the winds. Public opinion sometimes approves and disapproves the same thing, almost before the breath is cold that expresses its vascillating judgments. Besides, men who are deliberating to do wrong, or to pursue a doubtful course, are not apt to ask advice of such friends as disapprove their purposes. Such direction is, therefore, too one-sided and too much subject to the grossest errors to excuse the violation of a legal duty. The law of this case required the moneys of the wards to be annually loaned out on mortgage or bond, with sufficient security ; and, when it was possible, the interest should

have been collected and compounded.—Rev. Code, §§ 2426, 2427 ; *Allen v. Martin, supra.*

And if the money could not be so loaned, it was the duty of the guardian to keep it safely without change, as he would any other property of the wards in his hands, or invest it, under an order of the proper court.—Revised Code, §§ 2429, 2436, 2437. The guardian here wholly failed to do this, or to make any effort to do it. He did not even obey the requisitions of the enactment to which his co-defendant now appeals for his justification. He neither asked authority to make the investment in " interest-bearing bonds of the Confederate States," nor after it was made, did he report his action to the proper court for its approval, as required by the enactment above referred to. Pamph. Acts, 1861, No. 54, p. 54 ; Act Dec. 9, 1861. The result is, that he is liable to make good the loss occasioned by his misconduct. The fourth section of said enactment required the investment to be reported within a certain time, and refuses credit for it, unless this is done ; or a sufficient reason must be shown for the neglect to report.

Moreover, in this case the guardian himself does not pretend that he acted under any law, or that any existed, which authorized him to deposit his wards' moneys in the Bank of Mobile, in the manner that he did. He alleges, that he made the deposit, and " was forced by public opinion, and from his own best judgment of what was best, to take Confederate treasury-notes " for the deposit thus made. And after thus taking the Confederate treasury-notes from the bank, he " hesitated for a long time what he should do with the money, and after consulting many friends—good business men—and exercising his own best judgment, he concluded to invest in interest-bearing Confederate notes ;" which he thinks was done some time in 1862. These " notes" were safely kept by him until they were destroyed by the burning of his house, in 1865. Such excuses are wholly insufficient to justify the guardian's conduct. They are not sanctioned by any law. These Confederate treasury-notes were never a legal tender for the payment of debts. They were never lawful money, and could not be made so by any legislature of this State, the

Hall et al. v. Hall et al.

laws of which have recognition in this court.—*Chapman, Lyon & Noyes v. Cowles,* 41 Ala. 103, 112; *West, Oliver & Co. v. Ball & Crommelin,* 12 Ala. 340, 345; Const. U. S., Art. 1, § 10; Pasch. Ann. Const. U. S. 153, 154.

Young C. Hall, the co-defendent of the guardian in the court below, alleges, upon information, in his answer to complainants' bill, that the funds of the wards were deposited in the Bank of Mobile, "for safe keeping, for the benefit of said wards." But the testimony does not support this allegation. On the contrary, it shows that the information on which it was based was not true. The proof shows that the funds were deposited by the guardian in his own name, and for his own use, and he accordingly "checked" them out as such. His account with the bank does not show that the wards were at all known in the transaction. There was no sum of money deposited there for them, or sum corresponding in amount with the sum that belonged to them.

The same defendant also alleges, that when the guardian attempted, in 1862, to withdraw the funds thus deposited, "the bank refused to pay in gold or silver, or in current bank-notes, but tendered him Confederate treasury-notes, then equal in value to the bills deposited" by the said guardian, which were received by him, "for said deposit or for said debt; that immediately afterwards, said Hall invested the same in Confederate interest-bearing treasury-notes, for the use and benefit of his said wards, under and by authority of several acts of the general assembly of the State of Alabama, on this subject." But no reference is made to any law, with specific title and date of approval; nor is any such law known to this court, as a law of the State of Alabama, as now organized.

There is but one State of Alabama known to this tribunal, by its laws; that is the State of Alabama—a member of the Union—acting under the constitution of the United States, and in conformity to its requisitions. Any other State of Alabama is an usurpation, unconstitutional, illegal and void; and the acts of its general assembly partake of its own defects. They have no legal standing in this court,

32

unless it is shown that they have been re-enacted or adopted by the rightful government of the State. That the rebel government was an organized political body within the limits of this State, is not enough to give its enactments the force of laws. It must be a State admitted into the Union, and must derive its powers from the constitution and laws of the United States.—*Scott v. Jones*, 5 How. 343; *Cherokee Nation v. Georgia*, 5 Pet. 18.

The rightful State of Alabama, the only one known to this court as a State, has never been out of the Union; nor has it ever been destroyed, though its government has been suspended. The ordinance of secession was a nullity. It neither overthrew the State, nor repealed its laws. Its effects were therefore nothing. This is expressly affirmed by the supreme court of the United States, in the case of *Mauran v. Insurance Company*, in which, in speaking of the rebelling States, that court says: " We agree, that *all* the proceedings of these eleven States, either severally, or in conjunction, by means of which the existing governments were overthrown and new governments erected in their stead, were wholly illegal and void, and that *they* remained, after the attempted separation and change of government, in judgment of law, as completely under *all* their constitutional obligations as before. The constitution of the United States, which is the *fundamental law of each and all of them*, not only afforded no countenance or authority for these proceedings, but they were in every part of them in express disregard and violation of it.—6 Wall. pp. 1, 13 and 14. Then the rebel State government of Alabama was unconstitutional and wholly void; for what is unconstitutional is illegal and void, so far as law is concerned. And inasmuch as the rightful State of Alabama was never destroyed or out of the Union, no new State could be formed or erected within its boundaries, without the consent of congress, which was neither asked or obtained.—Constitution United States Art. 4, § 3, cl. 1; Pasch. Ann. Const. 234, 235. The general assembly of this illegal government and its laws could be no better than itself. All were void. *Ex nihilo nihil fit*. To give such laws any validity would be to justify, so far as such laws went, the abortive attempt to

overthrow the Union itself. These rebel governments have been declared illegal, and consequently void, by all the departments of the government of the United States, which is the supreme government in this nation ; the legislative, the executive, and the judicial, all concur in denouncing them as illegal.—Act of Congress, March 2d, 1867 ; President Johnson's Proclamation, June 21st, 1865 ; *Mauran v. Insurance Company*, 6 Wall. pp. 1, 13 and 14 ; *Texas v. White et al.*, January term Supreme Court U. S., 1869. The law, then, which is presumed to be appealed to by the defendant, Young C. Hall, in his answer in the court below, is not a law of this State, as at present organized ; and it never was a law of the rightful State of Alabama. Nor is it a law of such character as State or national comity requires should be treated with any respect. It afforded the guardian no authority to deal with his ward's estate as he has done ; because it carried with it no authority to bestow for that purpose. The enactment of the insurrectionary legislature, purporting to have been approved on December 9th, 1862, is supposed to be that relied on. It is entitled, " An act to authorize executors, administrators, guardians, and trustees to make loans to the Confederate States, and to purchase and receive in payment of debts due them, bonds and treasury-notes of the Confederate States, or the State of Alabama, and coupons which are due on bonds of the Confederate States and for said State." Pamphlet Acts, 1861, pp. 53, 54. This enactment proclaims in its caption an unlawful purpose—a purpose in direct contravention of the constitution and policy of the government of the United States ; and it was made to aid its overthrow and secure its destruction. It was in effect a war measure. It attempted to legalize the loaning of funds to the public enemy at war with the nation. This is forbidden. To give this enactment validity as a law, would be to declare, that the rebel organization holding control of the State of Alabama, was the legal government of the State, during the whole course of the late war, and that such government, for the time being, was a government in the State of Alabama above the constitution and laws of the United States, and that its enactments were legal ; that

is, they clothed those who acted under them, with authority, as valid laws, whatever might be their nature. We can not sanction such a proposition. To allow this defense, would be to legalize and enforce the rebel laws. It would be to re-enact and adopt them. This is a legislative power, and does not belong to this department of the government of the State.—Const. Ala. Art. 2, § 1, 2. There were doubtless many things done, and some laws passed in this State during the late rebellion, which ought to be ratified and adopted, but this enactment is not one of them. To adopt it would be to sanction the late rebellion and disregard the constitution of the United States. It is known to the court, as a matter of history, that " the Confederate States" and " the said State" mentioned in the caption of said enactment, were rebel organizations at war with the United States, seeking to destroy that government, and that the " bonds and notes of the Confederate States, or the State of Alabama," were issued by such rebel organizations in aid of such rebel war ; and as such they are illegal and void. If the rebellion failed, as every patriotic citizen had good reason to believe and to desire, then they were inevitably · bound to be utterly worthless. They were not such a currency as any State government, whether *de facto* or *de jure*, within the limits of the Union, could make a legal tender for the payment of debts ; unless, perhaps, the agreement was to pay in such currency. And even then it may be doubted whether the courts of the State, as at present organized, would enforce such contracts, as being tainted with crime, and in contravention of public policy.—28 Ala. Rep. 514.

It seems that this might suffice to settle the merits of this case ; but as it was pressed in oral argument at the bar, by the eminent counsel for the appellant, and is now again urged in his brief, that this case turns wholly upon a single proposition, it is fit that the court should so far consider this proposition as to settle it for the future. The proposition referred to, as the same is stated in the brief furnished to the court, is in these words : " During the war the constitution and laws of the United States were wholly suspended in Alabama, and were revived as the forces of

the United States acquired the *control of the territory.* The constitution and laws of the United States regained their power and control as the army did—they marched *pari passu* with the army."

This seems to me undistinguishable from the doctrine laid down in the case of *Watson and Wife v. Stone,* 40 Ala. 450, which has been repudiated and overruled by this court. *Coleman v. Chisholm,* January term, 1869. If it does not mean this, it is not perceived what the presence of the army had to do with the matters involved in this case in any way. The defendants below do not insist that they are excused by any military order, or that the guardian was forced by the insurrectionary army to make an illegal investment of his wards' estate. Unless, then, there was a government connected with this army, whose laws the army supported, and gave them validity by reason of its support, it does not appear to me that its presence or absence was of any consequence in this suit. If, however, it is intended, that this military occupation which suspended the constitution and laws of the United States, during its continuance, gave validity and legality to whatever government may have been connected with it, so as to give force and effect to its laws in this court, without re-enactment or adoption by the legislative department of the government as now organized, then we can not accept the proposition as true, nor sanction the consequences attempted to be adduced from it. This court can only acknowledge such States and such governments as have been previously acknowledged by the proper political department, having the power to make such acknowledgment.—*Scott v. Jones,* 5 How. 343 ; *Luther v. Borden,* 7 Howard. No such government has ever been acknowledged ; therefore, this court does not know that it ever existed as a law-making authority. If it did exist as such, it was forbidden by the constitution, and was wholly illegal and void. It had no legal authority, and could communicate none to its enactments. The evil tree can not bring forth good fruit. The offspring must follow the fate of the mother.—Const. U. S. Art. 4, § 3, cl. 1 ; Paschal's Ann. Const. p. 234, 235 ; Const. U. S. Art. 6, § 2, cl. 1 ; Paschal's Ann. Const. p. 248, 249, 250 ; *Ableman v. Booth,*

21 How. 505, 525; 6 Wall. 1, 13, 14; *The State of Texas v. White, et al.*; U. S. Supreme Court, January term, 1869.

But if it is intended, by the proposition above stated, to insist on the validity of the enactment of the rebel organization in the State of Alabama, which purports to have been approved on the 9th day of December, 1861, and to urge this as an authority for the guardian to collect the wards' moneys in Confederate treasury-notes, or to invest their funds in interest-bearing Confederate bonds, we must wholly refuse to give any such force.—Pamphlet Acts, 1861, p. 53, 54, No. 54. This enactment is no law of the rightful State of Alabama, and this court knows no other.—*Texas v. White et al., supra.* Law is a rule of civil conduct prescribed by the supreme power of the State.—1 Kent, 457, marg. And in the United States, such State, to have any legal existence as a law-making authority, must conform to the constitution of the United States. Here, the political organization that passed this enactment was not a State; because, to make it a State, it must have been admitted into the Union, and must have conformed to the constitution and laws of the Union.—5 Pet. 18; 5 How. 342, 377; Const. U. S. Art. 4, § 3, cl. 1; Paschal's Ann. Const. 234, 235; *Texas v. White, supra.*

It may also be said, that many laws are not compulsory commands, except to the courts which are charged with their enforcement. They are only enabling laws—mere permissions. A party may act under their authority, or he may refrain from acting; and if he voluntarily acts under them, without legal compulsion, and they turn out to have been passed by an incompetent legislative body, or are forbidden by the constitution, and for that reason void, they afford no protection. Even judgments founded on such laws can not be sustained. That is the case here.

The guardian does not pretend that he acted under any legal compulsion, but only under the force of public opinion, the advice of friends, his own best judgment, and certain acts of the rebel government of the State of Alabama. None of these, nor all of them, can authorize him to make an utter waste of his wards' estate. If this judgment was wrong, as it now turns out to have been, he can not be

permitted to visit its injurious effects on his wards.—Lewin on Trusts and Trustees, p. 366 e, marg.

Further, it may also be implied by the proposition above quoted, that, inasmuch as the constitution and laws of the United States were suspended in this State during the late war, until their restoration by the march of the federal army, then, the inhabitants of the State were freed from their constitutional obligations while this state of things lasted; and that, under such circumstances, the guardian was left without law to guide him, except that furnished by the insurrectionary occupying army, or by the power under which that army was maintained and directed; and if when so situated, he acted in good faith, and according to his best judgment, and upon the advice of persons conversant with such matters and capable of forming a sound opinion, then he ought to be excused, if loss to his wards resulted from his conduct; or, that, to avoid anarchy and preserve good order, he owed obedience to the organization exercising the powers of a government over him, and that this duty of obedience to the governing power, which he could not resist, justified him in acting in conformity to its laws.

These ingenious theories cannot yet be said to be incorporated into American law. Here all governments and all laws, except the law of force, are limited by written constitutions, and no theories can survive a collision with these constitutions. The vice of the above constructions is, that they set up in the limits of the State of Alabama—a member of the Union—a government hostile to the supreme government of the United States, and give authority to its legislative enactments, so as to excuse those who have acted under them, without regard to the character of the acts done. Or it makes the rebel army the government of the State for the time being, with power to enact laws in violation of the constitution of the United States. It is not to be presumed that such a pretension will, in the end, be supported by the supreme judiciary of the nation, the tribunal by which these difficult and vexed questions must ultimately be settled. We cannot, therefore, accord to it a standing in the judicial decisions of this State, until it is so supported and approved.—*Marbury v. Madison*, 1 Cra.

137, 177, 178, 179, *et seq.; Collier v. Frierson*, 23 Ala. 100, 109.

The original and amended bills in this case, were each demurred to as destitute of equity. These demurrers were overruled by the chancellor. In this, we do not think he erred. The original bill alleges, that Gerald B. Hall was regularly appointed guardian of the appellees, by the probate court of Mobile county, in this State, in May, 1861; that he gave bond as such, and took possession of about $9,000 of the wards' moneys; that he failed and neglected to make any inventory of the same, as required by law; that he made no annual settlement of his guardianship, or any other settlement; that he did not furnish said wards with any means of education or support, and did not loan out their funds, as required by law, but had used their entire estate for his own purposes, and had utterly wasted the whole; and that when requested by the wards to account for the funds in his hands, he refused to do so, and declared that it had been invested in Confederate securities, and had been burned up and lost. It was also stated in the bill, that the person who had been elected to the office of judge of probate of Mobile county, aforesaid, was disqualified to act and discharge the duties of his office; and that that court was so disorganized in consequence of the incapacity of the judge elect to hold the office, that no relief could be had therein; and that the complainants' case required the immediate and active interposition of the court. The relief asked, is a discovery of the amount of the wards' moneys received by the guardian, an account, his removal, and final settlement.

The amended bill alleges, that at the time the guardian executed his bond as such, the term of Judge Hitchcock had just expired, and Judge Bond was elected to succeed him; that in filling up the bond, the name of Judge Hitchcock was not stricken out, and the bond, by mistake, was made payable to him, instead of his successor, Judge Bond, as it should have been. This mistake was not observed at the time, but had occurred without the notice of any of the parties; that the bond was intended to be filled up as a proper guardian's bond. It was not signed by the

principal and securities on the same day, but all signed it
before it was approved ; and it was duly approved by Judge
Bond, who was then probate judge of said county of Mo-
bile. The prayer was for a reformation of the bond so as
to make it payable to Judge Bond. The filing of the
amended bill was objected to by the defendants below, and
the objection was overruled by the court.

The chancery court, since its first institution as a sepa-
rate tribunal, always had original jurisdiction of minors and
their estates.—2 Story Eq., §§ 1327, 1337, 1351 ; 1 Spence
Eq., pp. 428, 605, 611, marg. And it has long been set-
tled, that where the jurisdiction in equity has once existed,
the creation of another court, with a like jurisdiction, does
not abolish the original jurisdiction in chancery, unless the
law creating the new court expressly so declares. This is
not so with the law creating the probate court. The juris-
diction in equity is concurrent with that at law, where the
case is such, that a court of equity would have originally
interfered, and it appears that the court of probate was
not in a condition to perform its duties when called upon
to act.—28 Ala. 620 ; Rev. Code, §§ 698, 699 ; 1 Spence
Eq., p. 433, marg. ; 1 Story Eq., § 80.

It is one of the original powers of a court of chancery
to reform and correct mistakes in written instruments, upon
proper proof. And no authority is known in this State,
which withdraws a guardian's bond from the influence of
this power. The reformation of the bond does not make a
new bond, or one that the parties did not intend to make.
It only makes the old bond speak the truth, as the parties
to it sought to make it, when they entered into it. It is
sufficient, if the signatures to the bond were made before
it was approved. The matters of the amended bill might
have been incorporated in the original bill, and they would
not have made it bad. The allowance of the amendment
was, therefore, properly made.—*Whitehead v. Brown*, 18
Ala. 682 ; Rev. Code, §§ 3356, 3358.

There is, then, no error in the record. The decree of the
court below is affirmed. The appellants and their security
will pay the costs of this appeal in this court, and in the
court below. And the cause is remanded to the chancery

court of the county of Mobile, with directions to the chancellor to proceed upon the decree in that court in conformity with this opinion, and according to law.