## LAWSON *vs.* MILLER

[DEBT ON PROMISSORY NOTE GIVEN AFTER THE WAR IN RENEWAL OF A NOTE GIVEN FOR LOAN OF CONFEDERATE TREASURY-NOTES IN 1862.]

1. *Confederate treasury-notes; note for loan of, void.*—A promissory note given by one citizen of this State to another, during the late insurrection, and payable in this State for a loan of Confederate treasury-notes, is illegal and void.

Lawson v. Miller.

2. *Same;* A promissory note made in this State, since the suppression of the late rebellion, in renewal of such a note, is also illegal and void, and no action can be maintained thereon. (Ordinance 38, Convention 1867.)

APPEAL from Circuit Court of Hale.

Tried before A. BENNERS, ESQ., an attorney of the court, under § 758 of the Revised Code, the presiding judge having been of counsel.

The facts upon which the decision is based will be found in the opinion.

G. M. DUSKIN, for appellant.

W. & J. WEBB, *contra.*—"Illegality of consideration," when relied on as a defense, must be specially plead.—See 1st vol. of Chitty on Plead. (14th ed.) p. 515, 516 and 517, note *h.*

But, if this special plea in this case should be held to have put in issue the legality of the consideration of contracts given and executed for a loan of Confederate currency, we maintain the proposition—" that a loan of Confederate treasury-notes was a good and legal consideration to support a promise to pay," unless it be affirmatively shown, that such loan was obtained for some illegal purpose, (such as to hire a substitute to go in the Confederate army,) made known at the time to the party making the loan.

Wherever the loan was made, as in the case at bar, by one citizen of the State of Alabama to another citizen of the same State in the usual and ordinary transactions of business, and for no illegal object or purpose, at a time when there was no other currency or circulating medium in the State, and when, consequently, the people had to pay and receive payment in that currency or not at all, Confederate money must be held to have been, at such a time, and between such parties, so situated, a good and legal consideration for a promise to pay.

But the appellant will urge that the Confederate government was illegally organized for the purpose of making

40

war upon the United States, and the treasury-notes of the Confederate States were issued by it to enable it so to make its war upon the government of the United States. Conceding all that to be true, yet it does not follow as a matter of course that every citizen of this and every other Southern State, who, during the war, received and paid out Confederate money, was guilty of an illegal act. Nor does it follow, nor is it true, that a loan of Confederate money is such an illegal consideration, as that it will not support the contract.

*The law does not forbid or condemn that which is a matter of necessity.* What could have been a matter of greater necessity, than for citizens of this State, who had no other currency or medium of exchange for three years, *during that time,* to receive and pay out Confederate money or treasury-notes? For them so to do, was a daily necessity. In the every day transactions of life, it was impossible, during that time, when there was no other money in circulation, to avoid using and receiving this money. And if the loan is not affirmatively shown to have been made for the purpose of aiding the rebellion, or for some other illegal object, its loan could not be illegal, and if the money is shown to be of value, it will and must support the promise to pay.

In no work on the subject of contracts, have I been able to find anything of this kind as one of consideration so illegal as to vitiate the contract based upon it.—See 1st vol. Parsons on Contracts, (last ed.) pp. 456, 459, and Story on Contracts (ed. 1844) p. 87, &c. Where is the law to be found which so declares it to be illegal?

The illegallity of the Confederate government, and its issue of these treasury-notes, is *too remote* to affect this contract. None of the parties to this suit are shown to have had any connection with that government or the issuing of these notes. The supreme court of the United States, in the case of *Armstrong v. Toler,* reported in 11th Wheat. Rep. p. 268, in the opinion of the court by C. J. Marshall, he quotes the following language used by the court below, and in his opinion reaffirms it to be a correct exposition of the law, viz; " But if the promise be uncon-

nected with the legal act, and is founded on a new consideration, it is not tainted by the act, although it was known to the party to whom the promise was made, and although he was the contriver and the conductor of the illegal act;" and in the same case that learned judge decides—"*if the illegal act is not the consideration* of the contract, and is entirely disconnected from it, *the contract is valid, though the occasion for making the contract, arose out of the existence of the illegal act.*"—Curtis U. S. Sup. Ct. Rep. vol. 6th, p. 588. And in the case of *Rawdon v. Toby,* as reported in 11th How. U. S. Sup. Ct. Rep. p. 517, in 18th vol. of Curtis' Sup. Ct. Rep. p. 695, which was a suit brought to enforce the payment of notes given for the purchase of negroes imported from Africa into Texas in 1835. The plea offered was illegality of the importation of the negroes.

On this point, Justice Grier, delivering the opinion of the court, uses this language, pertinent to the case at bar: " On the argument here it was endeavored to be supported on the ground that the notes were void, because the introduction of African negroes both in Cuba and Texas was contrary to law. But in neither point of view will these facts constitute a defense in the present case. If these notes had been given on a contract to do a thing forbidden by law, undoubtedly they would be void." But the court adds, that the plaintiff " had no connection with the original illegal act of introducing the negroes contrary to law." In that same case of *Rawdon v. Toby,* the court goes on to say—" If the defendant should be sued for his tailor's bill, and come into court with the clothes on his back, and plead that he was not bound to pay for them, because the importer had smuggled the cloth, he would present a case of equal merit and parallel with the present, but would not be likely to have the verdict of the jury or the judgment of the court in his favor."

The same reasoning urged by Judge Grier with so much force, is applicable to the case of *Miller v. Lawson,* now under discussion. Miller had no more connection with the authorities at Richmond of the Confederate government, or with the illegal act of issuing these treasury-notes, than

did the purchaser of the tailor's suit of clothes with the illegal smuggling of the goods from which it was made.

In addition to the cases cited on the point discussed above, I refer to Story on Conflict of Laws, (2d edition,) §§ 248, 249, 250; and Story on Contracts, § 227, p. 146.

But there are some later cases than those above. I refer to *Phillips v. Hooker*, in which Judge Pearson of North Carolina rendered an able opinion, to be found in the number of the American Law Register for the month of October, 1868.

In the case of *Kepel's Adm'r v. Petersburg R. R. Co.*, (to be found in the January number, 1869, of the American Law Review,) Judge Chase, presiding over the U. S. circuit court, at Richmond, Va., rendered a decree for a dividend declared by the company in Confederate money. It was in a suit instituted by a stockholder in that road, for the recovery of a dividend ascertained and declared during the reign of the Confedrate government; declared for so many dollars, and founded upon the excess of the receipts of that road over its disbursements in *Confederate money*.

The opinion of Judge Chase says: "At the time several of the dividends were declared, the chief currency, and when the others were declared, almost the entire currency of that part of the country in which the railroad was operated, was in Confederate notes ; and whatever currency of bank notes there may have been in circulation, was of no greater real value. *This currency may fairly be said to have been imposed on the country by irresistible force. There was no other in which the current daily transactions of business could be carried on*, and there could be no other while the rebel government kept control of the rebel States. The necessity for using this currency was almost the same as the necessity to live. No protest, no resistance, could avail anything. At the same time this currency, though it depreciated rapidly, had a sort of value. Its redemption, though improbable, was not impossible, and until the downfall of the Confederacy it had a greater or less degree of purchasing power.

After assigning other and additional arguments, Judge Chase renders a decree for the value of the dividend in the

present legal currency of the United States; a decree which had no other foundation or consideration than the Confederate money received by the railroad.

In the case of *Miller v. Gould*, 38 Georgia Reports, where a contract was made between two citizens of the late Confederate States during the war, on the 12th day of July, 1862, payable three years after date, the consideration of which was Confederate treasury notes, the only circulating currency at that time, and which was recognized .as *lawful* by the assumed authority which had the actual possession and control over the territory and people at the time the contract was made,—"*Held*, that although the issuing of such notes by the assumed Confederate authority for the purpose of carrying on a war against the government of the United States, may have been illegal, as against that government and the citizens thereof, who, during the war, were under the actual protection of that government, outside of the lines of the assumed Confederate authority; yet, such a contract made between citizens residing within the lines of the assumed Confederate authority, *in their ordinary business transactions*, between themselves, and having no connection with the prosecution of the war against the United States, *is not an illegal consideration, as between the contracting parties themselves*, they having made the contract under the assumed authority, which was then over them, (whether rightfully or wrongfully assumed, is not now the question,) recognized the currency as legal and valid at the time the contract was made; therefore, as between the contracting parties themselves, the plaintiff below is entitled to recover."—See *Miller v. Gould*, 38 Ga.

In a recent case decided by Judge Chase, [I regret I have not the full facts and case before me,] the facts were about these: "An insurance company, doing business in New York, had an agency during the war in the city of Richmond, and the agent of the company in Richmond received from a citizen of Richmond, who held a life policy in the company, payment of the annual premiums in Confederate money. The party whose life was insured died, and since the war the widow of the deceased brought suit

on the policy for the recovery of the amount stipulated to be paid. The suit was resisted by the company, on the ground that Confederate money would not support the promise to pay. Judge Chase gave judgment in favor of the holder of the policy.

Neither the civil or criminal law, statutory or common, forbids and pronounces illegal any act or contract *which is a matter of necessity.* In criminal jurisprudence, the law of self-defence, justifying even to the taking of life, is an illustration of this proposition. So in the case of a ship-wrecked mariner, cast on shore without bread to sustain life, would be, in any court in the world, held perfectly justifiable in appropriating for that purpose, to his own use, anything which he might seize that would afford nourishment. *Necessitas excusat legem."*

Judge Chase, in his opinion delivered in the case of *The State of Texas v. White, Childs et al.,* uses an argument drawn from this law of necessity, to pronounce valid even some acts of the government of Texas, during the late war—" acts necessary for peace and good order."

In these States during the period of the late war, when there was no other medium of exchange, of barter and of sale than the Confederate currency, it can not be held for one moment that every citizen of such States, who either received or paid out Confederate money was guilty of an act illegal, and to be illegal it must be pronounced illegal either by statute, or by the principles of common law. It is not, and will not be contended that there is any statute on this subject. Then, to make the receiving and paying out of these notes, and every act of such receiving, &c., to be illegal, the principles of common law must be so plain, and so strong, as to overcome that most potent argument of *"necessity."* Is there any such rule at the common law? Judge Story, in his work on Contracts, says : " A contract may be illegal because it contravenes the principles of common law, or the special requisitions of a statute ; the former illegality exists whenever it violates public policy or morality."

The public policy of what! I answer of the State and government under which the parties live, and make the

contract. Whatever might have been the prohibition, arising from public policy, which, during the late war, prohibited a citizen of the State of New York, (then, and now under the government of the United States,) from trading with a citizen of the State of Alabama, in and for these treasury notes, or from making a contract based upon them as a consideration, yet the same rule of prohibition, arising from public policy, does not apply to a contract between two citizens of the State of Alabama, at a time when that State was under the dominion and arbitrary power of the Confederate government. The public policy referred to by Judge Story must be the policy of the *"lex loci contractus."* The public policy of Alabama, at the time of this loan, is illustrated by the acts of the legislature authorizing executors to receive Confederate money.

PETERS, J.—This was an action of debt, founded on a promissory note, in the words and figures following, to-wit :

"$447 50.    Greensboro, Ala., August 1st, 1865.    One day after date, I promise to pay W. G. Miller, or bearer, the sum of four hundred and forty-seven dollars and fifty cents, borrowed money, with interest from date. Witness my hand and seal.   [Rev. stamps, 25 cents.]

"L. LAWSON."

The suit was instituted by Miller against Lawson, in the circuit court of the county of Hale, in this State, on the 3d day of August, 1867, and was finally tried on the 30th day of March, 1869. The cause was submitted to a jury, who found for the plaintiff, Miller, and assessed his damages at one hundred and eighty dollars and eighty-two cents. For this amount the court rendered a judgment, and for costs. From this judgment Lawson appeals to this court.

From a bill of exceptions taken at the trial, it appears that the note in question in this case, on which the suit was founded, was given in renewal of another promissory note, which had been made between the same parties during the late war of rebellion, for a loan of Confederate treasury-notes. It had no other consideration. It was, then, a transaction to give circulation to what was called

"Confederate money;" that is, the treasury-notes issued by the so-called "Confederate government of America," for the purpose of supplying the means to that organization to pay its expenses and to carry on the war that it had levied against the United States.

This case is different, in principle, from any other case that has yet been before this court, or, so far as I am in-formed, before any judicial tribunal of a more general ju-risdiction in the Union. This is a transaction simply to give circulation, as currency, to Confederate treasury-notes. In other cases, the transaction has grown out of a sale or purchase of valuable legal property, about which the par-ties had the fullest right to contract, and the controversy has been, so far as I have been able to comprehend it, one in reference to the *medium* of payment,—whether this should be enforced, as the parties had agreed, in Confed-erate treasury-notes or not. Uniformly, I believe, thus far the decisions have been, that, so far as the stipulation to pay in Confederate treasury-notes was concerned, this has been disregarded, and the payment has been compelled to be made in the legal currency of the nation. The princi-ple that underlies these decisions must be, that the agree-ment to pay in Confederate treasury-notes was wholly void, and therefore might be disregarded. Otherwise, the party who made such a promise undoubtedly had the right to stand upon it, and pay only as he had agreed to pay. It is the essence of a contract, that a party can only be re-quired to perform what he agreed to do—neither more nor less. And as the promissor received a benefit, which he might lawfully receive, he ought, in good conscience and law, to be compelled to pay the reasonable value of the benefit thus obtained, if he held on to it or enjoyed it.— *Hale v. Houston, Sims & Co.*, January term, 1870 ; *Kitchell, Adm'r, v. Jackson*, January term, 1870 ; *Thorington v. Smith*, 8 Wall. 1 ; *Hitchcock v. Lukens*, 8 Por. 333 ; *Cobb v. Cow-dery*, 40 Vt. ; *Gelpecke v. City of Dubuque*, 1 Wall. 175, 206, at bottom.

The Confederate government, so-called, was an illegal and insurrectionary affair. Its design was treasonable against the United States. It levied open war against

them. The currency called Confederate treasury-notes were bills of credit made, issued and circulated to aid and maintain this illegal organization. They were issued for an illegal purpose by an illegal authority, and to support and strengthen, and carry on war levied by citizens of the United States against the government of the United States. This war was actually levied and being vigorously prosecuted when these treasury-notes were made and issued, and they were so made and issued and put in circulation to furnish the means to wage this war. Their issuance and circulation for this purpose was against the public policy of the nation. They were issued for warlike purposes, in aid of a treasonable war against the Union. They were therefore contraband, illegal and utterly void, from the beginning. And all who contributed to circulate them and give them currency as money, but contributed to repeat their issuance, and to participate in giving aid and success to an illegal act. The citizen was bound to know that the the authority that issued these notes was illegal and traitorous, and that they were issued and circulated to give aid and comfort to this illegal authority. Being illegal and traitorous in their origin and design, they could not be the basis of a lawful contract. To affirm such contracts would be to validify and carry out so much of the purposes and policy of the late Confederate rebellion, as they constituted a part of it. It would *pro tanto* have the effect to enforce the orders of *Gen. Van Dorn* and *Gen. Bates*, issued in the time of the late rebellion, for the same end. During the late war their issuance was to aid the war, which was an act of treason; and knowingly to circulate them was a participation in that act. Such paper can not be regarded as legal money, nor the foundation of a legal and valid contract. And the renewal of the note did not take away the illegality of the original transaction.—(*Chase, C. J., in Shortridge v. Macon*, 16th June, 1867; Paschal's Ann. Const. United States, p. 211, note 215; 2 Burr's Trial, pp. 439, 401, 405, *et passim; United States v. Fries*, Whar. St. Tr. 458; *Bollman's Case*, 4 Cr. 75; 1 Burr's Trial, 16; *United States v. Greiner*, 24 Law. Rep. 92; *United States v. Pryor*, 3 W. C. C. 234; *United States v. Hodges*, 2 Wh. Cr.

Cas. 477 ; *United States v. Michell*, 2 Dall. 348 ; *United States v. Hanway*, 2 Wall. Jr., C. C. 140 ; 1 Kent, 137 to 143, and cases cited ; *Armstrong v. Toler*, 11 Wheat. 258 ; *Ocean Ins. Co. v. Polleys*, 13 Pet. 157 ; *Kennett v. Chambers*, 14 How. 39 ; *Davidson v. Lanier*, 4 Wall. 447 ; *Brown v. Tarkington*, 3 Wall. 377 ; *Nordlinger v. Vaiden*, 2 Am. L. Rep. 188 ; *Bk. of Tennessee v. Union Bk.*, 2 Am. L. Rep. 346 ; *Ex parte Milner*, 16 Am. L. Rep. 371 ; *Avera v. Robertson*, 6 Am. L. Reg. 291, notes ; *The Peterhoff*, 5 Wall. 28.

Besides, this is a contract that most clearly comes within the effect of ordinance No. 38 of the convention of 1867. (Pamph. Acts 1868, p. 185, Ordn. 38, § 2.) In a case recently adjudicated in the highest court of the nation, the chief-justice declares : " But it must be remembered that the *whole* condition of things in the insurgent States was matter of *fact* rather than matter of law."—(8 Wall. 13.) Then the State, upon its restoration to power, might in its sovereign authority declare what such a state of facts, as is shown in this transaction, should amount to, in its courts. Here the transaction was begun within this State by citizens of this State, to be finished within this State. In such a case it has been well said by a recent able writer, on such subjects, that " each State has, then, by the present weight of authority, the right to determine, *for its own citizens* and *in its own* courts, *what it will*, in respect to a contract which is either made within its sovereignty, *or* to be performed there."—3 Par. Contr. p. 439, and note *w*, 5th ed., 1866. This is simply what has been done by the ordinance above referred to. And it is, so far as it is constitutional, the law of the State.—*Fletcher v. Peck*, 6 Cr. 87 ; *Mobile & Ohio R. R. Co. v. The State*, 29 Ala. 573.

The contract sued on in this case was then wholly void. The charges asked in the court below, were in conformity with the principles herein laid down, and it was error to refuse them.

The judgment of the circuit court is reversed, and the cause is remanded for a new trial.