# Newman v. Reed et al.

## Final Settlement of Guardian's Accounts.

1. *Parties to decree.* — A decree of the probate court, rendered against a guardian on final settlement of his accounts, will not be reversed on error or appeal, at his instance, because the names of all the wards are not set out in the decree, when their names are fully shown by the record, and no objection was taken in the court below on account of the parties.

2. *Loan of ward's funds by guardian.* — A guardian has authority, and it is made his duty by statute (Rev. Code, § 2426), to lend out the surplus money of his ward on bond and mortgage, or on good personal security ; and if he takes a note with sufficient sureties for money thus loaned, and resigns before the note becomes due, he is not responsible for any loss that may afterwards occur.

3. *Vouchers for credits, and proof thereof.* — When the items of credit in a guardian's account current are objected to and contested on his final settlement, they should not be allowed, unless supported by proper vouchers and sufficient proof of their correctness.

4. *Guardian's commissions.* — A guardian is entitled, on final settlement of his accounts, to commissions on the amount of his receipts and disbursements, as shown by the record ; and no voucher or proof *aliunde* is necessary to sustain the item for such credit.

5. *Receipt by guardian of Confederate currency.* — A guardian is responsible for the funds of his ward, converted by him during the late war, or by his agent or attorney, into "worthless C. S. currency," or Confederate States treasury-notes ; but he cannot be charged with any conversion, or neglect, or default, where the proof only shows that he received Confederate currency, in 1862, from an executor in Tennessee, but it is not shown when or how the rights of the wards accrued.

APPEAL from the Probate Court of De Kalb.

WATTS & TROY and FOSTER & FORNEY, for appellant.

M. J. TURNLEY & SON, *contra.*

PETERS, C. J. — This is an appeal by a guardian from a decree rendered against him on the final settlement of his accounts. He was regularly appointed, on the 29th November, 1858, as the "guardian of Thomas S. Reed, Margaret A. Reed, James P. Reed, William D. Reed, Sarah E. Reed, and Susan A. Reed, minor heirs of James Reed," deceased. At a special term of the probate court of De Kalb, in which said appointment had been made, William D. Reed, one of said heirs, filed his petition on the 27th November, 1869, praying that said Newman, the guardian, be notified " to file his accounts and vouchers, and make a final settlement of his said guardianship." On this petition, there was an order of court granted, requiring " said Moses C. Newman, guardian as aforesaid," after proper service of notice, " to file his accounts and vouchers for a final settlement of his said guardianship." In obedience to this order, the guardian appeared, and filed his account, which is set out in the record, in these words : —

" The amended account-current of M. C. Newman, as guardian of James P. Reed, William D. Reed, Sarah E. Reed, and

[Newman v. Reed.]

Susan A. Reed, children of James Reed, deceased, on final settlement.

" *Dr.*

" March 14, 1862.  To amount collected and received of John S. Felton, attorney-at-law, Fayetteville, Tennessee, which amount was collected by said attorney from the executors of Nathan Reed, in Lincoln county, Tennessee, and sent to this guardian, viz., in C. S. currency  .  .  .  $1,314.50

" *Cr.*

" August 18, 1862.  By amount returned into court, viz., note on Sarah Reed, and W. D. Petty and Thos. Petty, security, for a portion of said currency loaned by guardian, dated 21st March, 1862, payable twelve months after date  .  .  .  600.00

" March 21, 1862.  By amount C. S. currency  .  .  643.20

"         "         By amount paid Sarah Reed, for necessaries for said wards  .  .  40.00

"         "         By amount cash expenses in collecting said currency, as above set out  .  .  .  .  .  .  .  .  .  19.68

"         "         By amount of taxes in year 1862      6.75

"         "         By amount of commissions for collecting and paying out  .  .  65.72

"         "         By amount worthless C. S. currency, less amount paid out by him, by virtue of his guardianship  .  .  .  .  .  .  .  .  $1,314.50"

This account was properly verified by affidavit, as required by law.  The record then shows that this account was contested by " W. D. Reed *et al.*"; and they assigned in writing six grounds of objection to the several items of credit in the same, " and asked that said credits be not allowed."  Upon these objections an issue was made up, and the same was submitted to the court for trial.  On the trial of this issue, the guardian offered himself as a witness, and testified as follows : " That he, as such guardian, received the amount, as charged in his account, from the executors of Nathaniel Reed, through his agent, in C. S. currency ; and that a small amount of the money collected may have been in Tennessee State bank-notes; but he received, together with it, some for others who were alike interested, and he considered the amount charged as received for the contestants : and that on the      day of       , 1862, he resigned his trust, and filed his account for a final settlement ; and that on the day set for the settlement, as shown by the record, he, as such guardian, made what he supposed to be a final settlement, and returned into court the assets for

[Newman v. Reed.]

which he now claims credits, as shown by his account; and that at the time he loaned the money referred to in his account, the sureties on the note were solvent, and that he considered the C. S. currency at that time at par value."

" This being all the evidence adduced in the cause, the court overruled or refused to sustain said account, and upon the testimony, as above set out, charged said guardian as shown in this decree." The decree, as copied in the record, states the names of the parties thus : " W. D. Reed *et al. v.* Moses C. Newman, late guardian of the minor heirs of James Reed, deceased ; " and is in these words : " It is therefore ordered," &c., " that the plaintiffs recover of and from the defendant the sum of two thousand one hundred and nineteen $\frac{70}{100}$ dollars ; it appearing to the court, after all the evidence adduced in the cause, argument on both sides, an examination of the accounts and vouchers filed, and due and careful consideration thereof, that so much is due of debt, principal and interest thereon ; for which execution may issue, together with the costs of this proceeding."

The following errors are assigned on this decree : " 1. The decree does not show who are the plaintiffs, or in whose favor it was rendered. 2. The decree, instead of being for plaintiffs, should have been for the defendant. 3. The decree does not allow the guardian any credit for moneys paid by him. 4. There was no proof of the value of Confederate States treasury-notes, or that they were of any value. 5. The decree is for too large an amount. 6. There is no evidence to sustain the decree."•

1. The objection to the description of the parties to the decree is not sufficient. The names of all the wards appear in the record. Any deficiency in this particular should have been objected to in the court below, where it could have been amended. If William D. Reed was the only party complaining, judgment should have been rendered in his name alone, for his share of the funds in the hands of the guardian. Rev. Code, §§ 2811, 2422.

2. The powers and the duties of a guardian, appointed in this State, over the property of the ward, are very clearly pointed out by the Code. " It is the duty of the guardian to manage the estate of his ward frugally, and to improve it to the best of his skill and ability. He must, if practicable, lend out all surplus money of the ward, on bond and mortgage, or on good personal security; and if the bond is not renewed annually, require the interest to be paid at the end of each year." Rev. Code, § 2426 ; *Hall* v. *Hall*, 43 Ala. 488. A guardian is a trustee, and the general principles regulating trusts apply to him. 2 Kent, 230–31, and notes. If a trustee acts with due diligence and fidelity in the discharge of a duty imposed upon him by law, and proceeds as the law directs, he is not to be held

[Newman v. Reed.]

responsible if injury or loss thus accrues to the beneficiary. This is certainly the principle applicable to executors and administrators in this State. *Gould* v. *Hays*, 19 Ala. 438 ; *Henderson* v. *Simmons*, 33 Ala. 291 ; *Ivey* v. *Coleman*, 42 Ala. 409 ; *Stewart's Adm'r* v. *Stewart's Heirs*, 31 Ala. 207. This is also a proper rule to apply to guardians. 4 Bac. Abr. Bouv. p. 561.

The evidence in this case does not show that there was any negligence on the part of the guardian in collecting the promissory note on Mrs. Reed. It was given for funds of the wards, which the guardian had loaned her before his resignation ; and it had not become due at the time of the resignation. It was loaned on solvent personal security. The guardian had authority to do this, and it had been done in a proper manner. Rev. Code, § 2426, *supra*. It did not appear that it had been lost by his neglect. The note was for the sum of six hundred dollars. It was dated March 21, 1862, and fell due in twelve months after date. It was a portion of the sum of $1314.50, which had been received from the executor of Nathan Reed, deceased, in the State of Tennessee. Upon the evidence set out in the record, this item of credit should have been allowed the guardian. The court below erred in refusing it.

3. The guardianship commenced in November, 1858. There were six wards. It is not pretended that the guardian received any property belonging to them, before the sum of $1314.50 was received in March, 1862. There were, then, at least three years and near four months intervening between the commencement of the guardianship and the date at which any funds came into the hands of the guardian. It is highly probable that a claim for so small a sum as $40.00, for necessaries for the wards during these three years, was altogether reasonable. Had there been any evidence, or any sufficient voucher, to sustain this item, it ought to have been allowed. It was objected to for this reason by the contestants. The objection is in these words : " 6. Because said guardian has filed no vouchers whatever for the credit side of said account, the plaintiffs ask that said credits be not allowed." This objection also applies to the credit asked for $19.68, " cash expenses collecting C. S. Currency ; " and for $6.75, " taxes for year 1862 ; " and for $1314.50, " amount of worthless Confederate currency." There is no proof or vouchers to sustain these items. They were, therefore, properly refused as credits by the court on the trial below, though, upon sufficient proof, by voucher or otherwise, they were proper items of credit in such a case as this. The court did not err in refusing to allow them, for the reason that there were no vouchers or proof to sustain them.

4. But the item of credit for $65.72, " commissions for collecting and paying out," stands in a different attitude. This was compensation to the guardian, by way of commis-

[Newman v. Reed.]

sions on disbursements and receipts. Of this the court takes notice, without proof or vouchers, except as the record shows the amounts of the disbursements and the receipts. Upon final settlement, the guardian should be allowed the same compensation as executors and administrators. Rev. Code, §§ 2449, 2161, 2162. Some compensation should have been allowed. The court erred in refusing it altogether, on the evidence shown in the record.

5. There seems to be but one other question in this case, as presented by the present record, which needs to be discussed and settled, in order to enable the court below to proceed without embarrassment, on a new trial. This question arises out of the guardian's act in collecting the amount due his wards from the executor of the estate of Nathan Reed, deceased, in the State of Tennessee. The proof does not show how this sum of $1314.50 came to be converted into " C. S. currency," or whether the act of conversion was occasioned by the guardian himself, or by some one else without any neglect of duty by the guardian. The guardian would only be liable, in the event the conversion was his own act, whether done by himself or his attorney, or that it had been brought about by his negligence. If he occasioned the conversion by himself, or by his attorney, or by any want of proper diligence in attending to the interests of his wards, he would be liable for any loss that they might thereby sustain. A guardian has no authority to change his ward's property into "worthless C. S. currency," whatever that may be. *Hall* v. *Hall*, 43 Ala. 488; *Lane & Wife* v. *Mickle*, 46 Ala. 600; *S. C.* 43 Ala. 109.

If Nathan Reed died in the State of Tennessee, leaving an estate there in property or money, subject to distribution among his next of kin or legatees, or if he owed the wards a debt, then, if the wards of Newman, the appellant, occupied any of these relations towards said decedent, they would become entitled to this property or money on his death, by inheritance, or by his will, or as his creditors. Whatever this property might be, the wards would have a vested right in it as the owners. This property could not be taken away from them, and something else substituted in its stead, except by due course of law. *Gunn* v. *Barry*, 15 Wall. 610. If this property was money, or some other specific thing, then the heirs and distributees, or legatees or creditors, as the case might be, became invested with such right to it, whether money or other specific thing or debt, as the laws of the State of Tennessee, or the will of the deceased, bestowed upon them. This right of property being a vested right, it may be well doubted, whether the State could so invade it as to change this property into ' " Confederate States currency," which was

worthless, or liable to become worthless, without the consent of the owners. Governments are not established by the people to impair or to destroy vested rights, but to protect them. Vatt. b. 1, ch. 4, s. 51; see also, 18 Wend. 56; 4 Conn. 225; 1 Bay, 252. And particularly those of the minors, orphans, and the widows of the State, to whom the government stands in the attitude of *parens patriæ*, the highest and most sacred of all political relations. 2 Story's Eq. §§ 1327, 1328.

Assuming that the expression " C. S. currency," as used by the guardian in stating his account, means " Confederate States treasury-notes," then it is clear that this currency was issued and put in circulation by an illegal and treasonable government; to aid in the illegal and treasonable purposes of that government. It was simply a war currency, and had no value except for that purpose. It was the nerve of vitality in the right arm of the insurrection. These notes, it is said, " As contracts in themselves, except in the contingency of a successful revolution," " were nullities; " " for, except in that event, there would be no payer. They bore, indeed, this character (nullities?) upon their face, for they were made payable only " after the ratification of a treaty of peace between the Confederate States and the United States of America." CHASE, C. J., in *Thorrington* v. *Smith*, 8 Wall. 1, 11. It can hardly be denied that the purse and the sword, money and arms, are equally necessary to carry on war successfully. They belong to the war power of all governments not merely visionary. This is very clearly shown in the arguments on which the " legal tender cases " were determined. 12 Wall. 540, opinion of STRONG, J. pp. 540, 541, *et ubique*; Tiffany on Government, pp. 244, 245, §§ 427, 428; Ib. pp. 248, 249, §§ 432, 433. For a like reason, of the worthless and treasonable character of these notes, a similar currency issued by the State of Arkansas during the rebellion has been pronounced illegal and void by the supreme judicial tribunal of the nation. *Hanauer* v. *Woodruff*, 15 Wall. 439; see, also, *Miller* v. *Lawson*, 44 Ala. 616. Then, a conversion or transmutation of the property of the ward, into such a currency was an improper interference with their rights of property, and it is forbidden by the constitution of the State. Const. Ala. Art. I. §§ 8, 25. Consequently, the sections of the Revised Code numbered 2134, 2135, so far as they attempt to legalize such a conversion, are unconstitutional and void. Rev. Code, § 2425.

The supposition that this spurious currency was issued to supply a want of the people for a circulating medium, is hardly supported by reason or fact. At the breaking out of the rebellion, all the seceding states were supplied with a bank and specie currency, sufficient for their wants. There was no com-

plaint of any deficiency in this respect. But, as soon as the war was inaugurated, its necessities demanded a vastly increased amount of circulation of some kind to meet the enormous requisitions of the military and civil service of the insurrection. To furnish this, the " Confederate States currency " was prepared and issued, not by the states, or under their authority, but by the war power of the insurgents; and it lived only with this power, and died with it. If it displaced the legitimate and legal currency of the insurrectionary states, it was because their population favored the rebellion, and gave this currency circulation for the same reason that it had been issued, to aid in carrying on the rebellion. It had none of the elements of a sound circulating medium about it. It was wholly spurious. It was not a legal tender in the payment of any legal debts, and it was not convertible into any other currency that was such legal tender. I cannot, therefore, believe that there is, or ever was, any power in the state government to sanction the conversion of the estates of the orphans and widows who inhabit it, and who have no political power to protect themselves, and their right to enjoy their property, into such worthless and illegal currency. I do not think that the case of *Thorrington* v. *Smith* is intended to sanction such a proposition. 8 Wall. *supra*. If it does, the case of *Hanauer* v. *Woodruff* (15 Wall. *supra*) looks toa return to a so under doctrine. The guardian must show, upon a new trial, that the funds or property of his wards in the hands of the executor of Nathan Reed, deceased, were not converted into " Confederate treasury-notes " by his act, or the act of his attorney, or by any failure of duty on his part; or he must be charged with such funds or property after deducting all proper credits, as indicated above. The section of the Code above referred to cannot protect him. See *Fletcher* v. *Peck*, 6 Cran. 87; *Taylor* v. *Porter*, 4 Hill, N. Y. 146. But it may be proper to add, that if the wards' property or funds were in the State of Tennessee, the guardian's power over them would be governed by the laws of Tennessee, until they were removed to this State. Story Confl. §§ 504, 512, 513 *et seq.*

The judgment on a new trial, if for the wards, should be rendered in favor of each one separately, for his share, or for the share of each of those who ask to have a final settlement enforced. If, on the other hand, it is against the wards, then the judgment should be rendered in favor of the guardian, for costs, against those who joined in the proceedings in the court below. Rev. Code, §§ 2137, 2157, 2158, 2449, 2450.

The judgment of the court below is reversed and remanded. The appellees will pay the costs of this appeal in this court, and in the court below.