## HANAUER *v.* WOODRUFF.

1. Bonds issued by authority of the convention of Arkansas, which attempted to carry that State out of the Union, for the purpose of supporting the war levied by the insurrectionary bodies then controlling that State against the Federal government, do not constitute a valid consideration for a promissory note, although bonds of that character were used as a circulating medium in Arkansas and about Memphis in the common and ordinary business transactions of the people.

2. The case of *Thorington* v. *Smith* (8 Wallace, 1) approved, but distinguished from the present case.

ON certificate of division in opinion between the judges of the Circuit Court for the Eastern District of Arkansas; the case being thus:

Hanauer sued Woodruff in the court below upon a promissory note executed by the latter, at Memphis, Tennessee, on the 22d of December, 1861, for $3099, payable twelve

months after date, if not before, with interest after maturity at the rate of 8 per cent. per annum. The case was tried in the District of Arkansas, by the Circuit Court, without the intervention of a jury, by stipulation of the parties. And the court found, specifically, that the only consideration of the note was certain bonds, issued by authority of the convention which attempted to carry the State of Arkansas out of the Federal Union, by an ordinance of secession; that these bonds were issued for the purpose of supporting the war levied by the insurrectionary bodies then controlling that State against the Federal government, and were styled "war-bonds" on their face, and that the purpose of their issue was well known to both the plaintiff and defendant. The court further found that at the time of the transaction between the parties, that is, at the time the note was given, these war-bonds had at Memphis and in Arkansas a value 25 per cent. below their par value; that those received by the defendant were not used nor intended to be used by him in direct support of the war, but were received by him to be used in the ordinary course of his business; and that bonds of this character were at that time used as a circulating medium in Arkansas and about Memphis, in the common and ordinary business transactions of the people.

Upon the facts thus found, the following questions of law arose, upon which the judges of the Circuit Court were divided in opinion:

1st. Was the consideration of the note void on the ground of public policy, so that no action could be sustained upon it in the Federal courts?

2d. Was the consideration of the note illegal under the principles of public law, the Constitution of the United States, and the laws of Congress, and the proclamations of the President relating to the rebellion, which existed and was pending when the note was made?

3d. If the bonds were a sufficient consideration to sustain the action, what was the measure of damages?

These three questions were now sent up to this court for answers.

*Mr. A. H. Garland, for the plaintiff, Hanauer:*

1. While it is true the *bonds* for which the note in suit was given were issued to be used in carrying on the war against the United States, yet as the particular bonds obtained by the defendant of the plaintiff were not used or intended to be used in support of that war, the contract is not void, but stands upon a good and valid consideration. The issuing of the bonds by the State of Arkansas can have no bearing on the matter now in question, unless both the parties to the note participated, in making their contract, in the intention with which the bonds were issued. The contract must grow out of, immediately, or be connected with, the immoral or illegal act to vitiate it; and if the promise be entirely disconnected from the illegal consideration or act, and is founded on a new consideration, it is good; and this though the party to whom the promise is made is the contriver and the conductor of the illegal act. This is the view taken by this court in *Armstrong* v. *Toler,** Kennett* v. *Chambers,†* and by other courts in numberless cases.

The defendant got the bonds and used them legitimately, and they were worth to him not much less than the sum expressed on their face. He did not use them for the war, nor did he intend to do so. To him they were as money. He should not be heard to say they were not money.‡

Recovery was denied in *Hanauer* v. *Doane,§* because the notes sued on were given for goods sold in aid of the rebellion, both buyer and seller having knowledge of the use intended to be made of the goods.

2. But the finding by the court, that the bonds were used as a circulating medium among the people within the Confederate lines at and about Memphis, and had there much value, brings the case directly within *Thorington* v. *Smith.‖* The doctrine of that case leaves nothing to discuss here. Indeed, without *Thorington* v. *Smith,* upon general principles,

---

* 11 Wheaton, 258.                              † 14 Howard, 38.

‡ Pickard v. Bankes, 13 East, 20; Mason v. Waite, 17 Massachusetts, 563.

§ 12 Wallace, 342.                              ‖ 8 Id. 1.

this court has fully recognized as law all that is asked for Hanauer, and places that recognition upon the very cases already cited in this argument.*

3. *What is the measure of damages?*

This question is almost solved in determining the other. The note was given for so many dollars; and nothing less than dollars, as contracted for, will discharge the contract. The parties made their own contract and used plain words to express their meaning.

Mr. Justice FIELD delivered the opinion of the court, as follows:

The first question presented is embraced within the second, for if the consideration of the note was illegal under the Constitution of the United States and the laws of Congress, there can be no inquiry whether it was void for reasons of public policy. There can be no public policy in this country which contravenes the law of the land. And that the consideration was illegal and void under the Constitution and laws of the United States, does not admit of a doubt. If the Constitution be, as it declares on its face it is, the supreme law of the land, a contract or undertaking of any kind to destroy or impair its supremacy, or to aid or encourage any attempt to that end, must necessarily be unlawful, and can never be treated in a court sitting under that Constitution and exercising authority by virtue of its provisions, as a meritorious consideration for the promise of any one. The obligations of a traitorous combination, issued expressly to make war against and overthrow the government of the United States, can never give validity to any transaction which must seek the courts of that government for enforcement.

The issuing of the bonds in question was an act of open hostility to the United States; it was an act by which the convention declared its adherence to their enemies, and it gave aid and comfort to them. The purpose of their issue

---

\* Thomas *v.* City of Richmond, 12 Wallace, 349.

being inscribed upon their face, notice of their character was imparted to every one. Wherever they were carried, they showed the taint of their origin, and no one could take them, or give currency to them, or part with value for them, without knowingly adding to the strength of the insurgents, and thus in some degree furthering their cause.

An ingenious argument is presented on the part of the able and learned counsel of the plaintiff, by which it is attempted to sustain the validity of the note in suit on the ground that it is a contract collateral to that upon which the bonds were issued, and therefore not tainted by it; and on the further ground that it is a contract based upon a valid consideration within the authority of the decision in the case of *Thorington* v. *Smith*.*

Neither ground can be maintained. The contract expressed by the note is indeed collateral to that upon which the bonds were issued; that is to say, it is not the same, but a different contract. Yet it is connected with that contract by the fact that the bonds constitute its consideration; it therefore gives value and currency to those bonds, and to that extent advances the purposes for which the bonds were issued. It thus draws to itself the illegality of the original transaction.

When a contract is thus connected by its consideration with an illegal transaction a court of justice will not aid its enforcement. It is sometimes said that the test whether a demand connected with an illegal transaction is capable of being enforced at law, is, whether the plaintiff requires any aid from the illegal transaction to establish his case. This test was given in *Simpson* v. *Bloss*,† by the court of Common Pleas, in England. But it is too narrow in its terms and excludes many cases where the plaintiff might establish his case independently of the illegal transaction, and yet would find his demand tainted by that transaction. He might, in some instances, establish his case by showing a simple loan of money, or a simple sale of goods, yet the court would

---

* 8 Wallace, 1.                    † 7 Taunton, 246.

hold the contract of loan or sale to be invalid if at the time the money was loaned or the goods were sold he knew they were to be used for an illegal and criminal transaction, and the contract was made to further its execution.*   Such was the decision of this court in the recent case of this same plaintiff against Doane, reported in 12th Wallace.   There goods were sold to the defendant, the vendor knowing at the time that they were to be used in aid of the rebellion, and it was held that the sale was, from this knowledge, an illegal transaction on the part of the vendor and did not constitute a valid consideration for the note of the purchaser; and it was further held that due-bills given by the purchaser when taken up and paid by third parties with knowledge of the purpose for which they were issued, were equally invalid as a consideration for his note in their hands.

But notwithstanding the narrow terms of the test mentioned in the English decision, the present case falls directly within them.   No inquiry can be made into the consideration of the note in suit without disclosing that it consists of bonds issued by one of the insurgent States to support the war levied by them against the United States.   The plaintiff, therefore, cannot establish his case, his demand being contested, without aid from that illegal and treasonable transaction.

The decision in *Thorington* v. *Smith*,† does not control the present case.   There it appeared that the plaintiff, Thorington, had sold a parcel of land situated in Montgomery, Alabama, to the defendant for $45,000.   At that time, Alabama was in the occupation of the civil and military authorities of the Confederate States.   There was no gold or silver coin, nor were there any notes of the United States in circulation in that State.   The only currency in ordinary use, in which the daily business of the people was carried on, were treasury notes of the Confederate States, which in form and general appearance resembled bank bills.   In these notes

---

* Cannan *v.* Bryce, 3 Barnewall & Alderson, 179; Pearce *v.* Brooks, i Law Reports, Exchequer, 214.

† 8. Wallace, 1.

$35,000 of the purchase-money of the land were paid, and a note was given for the balance, payable by its terms in dollars. It was by that term that Confederate notes were designated.

Upon the suppression of the rebellion these notes became of course valueless. Thorington then filed a bill to enforce a vendor's lien upon the land sold, claiming the balance of the stipulated purchase-money in lawful money of the United States. The defendant set up as a defence that the purchase of the land was made at Montgomery, Alabama, where the parties at the time resided; that the only currency then in vogue there consisted of treasury notes of the Confederate government; that the contract price for the land, $45,000, was to be paid in those notes; that $35,000 were thus paid; that the note in suit given for the balance was to be paid in the same manner, and that the actual value of the land in lawful money of the United States was only $3000. The court below held that as the payment was to be made in Confederate notes the contract was illegal, and dismissed the suit, and the case was brought to this court for review. One of the questions presented, and the most important one was, whether the contract thus made for the payment of Confederate notes during the rebellion, between parties residing in the Confederate States, could be enforced in the courts of the United States.

In examining this question, the court referred to the establishment of the Confederate government in 1861, and to the power it exercised over the territory of the States confederated in insurrection, observing that it was the actual government of all the territory of the insurgent States, except those portions protected from its control by the presence of the armed forces of the United States. It then considered the character of this government, and classed it in that description of *de facto* governments, which were aptly termed governments of paramount force. The distinguishing features of this kind of government, the court said, were, "(1) that its existence is maintained by active military power within the territories and against the rightful authority of

an established and lawful government; and (2) that while it exists it must necessarily be obeyed in civil matters by private citizens, who by acts of obedience rendered in submission to such force, do not become responsible as wrongdoers for those acts, though not warranted by the laws of the rightful government."

Illustrations of this sort of government were found in the case of Castine, in Maine, reduced to British possession during the war of 1812, and in the case of Tampico, in Mexico, occupied by the troops of the United States during the war with that country in 1846 and 1847.

As to Castine, that place was captured in September, 1814, by the British forces, and remained in their possession until the ratification of the treaty of peace in February, 1815. "By the conquest and military occupation of Castine," this court said, by Mr. Justice Story, in *United States* v. *Rice*,[*] "the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over that place. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender, the inhabitants passed under a temporary allegiance to the British government and were bound by such laws, and such only as it chose to recognize and impose. From the nature of the case no other laws could be obligatory upon them, for where there is no protection or allegiance, or sovereignty, there can be no claim to obedience."

As to Tampico, that place was taken possession of in November, 1846, by the military forces of the United States, and in December following the entire State of Tamaulipas, in which Tampico is situated, was reduced to military subjection by our forces, and both Tampico and the State remained in our occupation until the treaty of peace in 1848. While thus captured and held in subjection other nations

---

were bound, as this court said, speaking through Chief Justice Taney, in *Fleming* v. *Page*,* "to regard the country, while our possession continued, as the territory of the United States, and to respect it as such. For by the laws and usages of nations, conquest is a valid title while the victor maintains the exclusive possession of the conquered country. The citizens of no other nation, therefore, had a right to enter it without the permission of the American authorities, nor to hold intercourse with its inhabitants, nor to trade with them. As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries."

After referring to these cases of Castine and Tampico the court said that it was among the governments, of which these are examples, that the Confederate government established for the insurgent States must be classed, though it differed from them in the circumstance that its authority did not originate in lawful acts of regular war; that it was not, however, on that account less actual or less supreme; that to the extent of its actual supremacy, however gained, in all matters of government within its military lines, the power of the insurgent government could not be questioned; that though that supremacy did not justify acts of hostility to the United States, it made obedience to its authority in civil and in local matters not only a necessity, but a duty; and that without such obedience civil order was impossible. It was by this government, said the court, exercising its power through an immense territory, that the Confederate notes were issued early in the war; that they became in a short time almost exclusively the currency of the insurgent States; that while the war lasted they were used as money in nearly all the business transactions of many millions of people; and that they must, therefore, be regarded *as a currency imposed on the community by irresistible force*.

From these considerations the court held that it followed

* 9 Howard, 614.

"as a necessary consequence from this actual supremacy of the insurgent government as a belligerent within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government temporarily occupying a part of the territory of the United States. Contracts stipulating for payments in this currency cannot be regarded for that reason only as made in aid of the foreign invasion in the one case or of the domestic insurrection in the other. They have no necessary relation to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection." And so the court held that such contracts could be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation.

There is nothing in the case at bar which has any analogy to the case cited. In the latter case the transaction was in a currency imposed by irresistible force upon the community, in which currency the commonest transactions in the daily life of millions of people, even in the minutest particulars, were carried on, and without the use of which there would have been no medium of exchange among them. The simplest purchase in the market of daily food would, without its use, have been attended with inconveniences which it is difficult to estimate. It would have been a cruel and oppressive judgment, if all the transactions of the many millions of people, composing the inhabitants of the insurrectionary States, for the several years of the war, had been held tainted with illegality, because of the use of this forced currency, when those transactions were not made with any reference to the insurrectionary government.

In the case at bar the war-bonds issued by the secession ordinance of Arkansas, though used as a circulating medium

Opinion of Miller, J.

in that State and about Memphis, did not constitute any forced currency which the people in that State and city were obliged to use. They were only a circulating medium in the sense that any negotiable money instruments, in the payment of which the community has confidence, constitute a circulating medium. The difference between the two cases is the difference between submitting to a force which could not be controlled, and voluntarily aiding to create that force.*

The first two questions certified to us must, therefore, be answered in the affirmative. The third question does not show any matter upon which the judges of the Circuit Court were divided in opinion, but, in any event, it requires no answer.

Mr. Justice MILLER:

I assented with much reluctance to the opinion in the case of *Thorington* v. *Smith*.

But I did assent to it on the ground that, while it was unsupported by and in some degree at variance with the general doctrine of the turpitude of consideration as affecting the validity of contracts, it was necessary to be established as a principle to prevent the grossest injustice in reference to transactions of millions of people for several years in duration.

I think the present case comes within that principle.

But I am content that the case of *Thorington* v. *Smith* shall be so limited, modified, and explained as to make it inapplicable to any further class of cases at all probable in the history of this country.

The necessity in which it was founded has passed or is rapidly passing away, and I acquiesce.

---

* See Head v. Talley, decided by the Chief Justice in the Circuit Court in Virginia, 3 American Law Times, 155.