[Opinion delivered June 7, 1880.]

---

R. S. SIMPSON ET ALS. v. ELIZABETH MULLEN, ADM'X.

(Case No. 3231.)

1. CONFEDERATE BONDS — CONTRACT PAYABLE IN, MAY BE ENFORCED.—
   A contract as follows: "$12,000. Due Peter Mullen or order
   twelve thousand dollars, bearing seven per cent. per annum interest
   until paid, in Confederate States seven per cent. bonds, which we
   or either of us do promise to pay to Peter Mullen, or order, on or
   before the 1st day of August next, with seven per cent. interest
   from date, it being for his stock of cattle which we have purchased
   from him this day in the following marks and brands " (describing
   the cattle). " In testimony whereof," etc. Signed and dated June
   17, 1863; being between parties who resided within the Confederate
   States, made on a sale of property in the usual course of business,
   and not for the purpose of giving currency to the bonds or other-
   wise aiding the rebellion, is not illegal and may be enforced,
   Thorington v. Smith, 8 Wall., 1; Hanauer v. Woodruff, 15 Wall.,
   439; Lumpkin v. Smith, 46 Tex., 52.

APPEAL from Burleson. Tried below before the Hon. A. S. Broaddus.

This suit was brought by Peter Mullen, the appellee's intestate, against Joseph F. Grant and Peter W. Dudley, in their life-times, and is since prosecuted against the appellants' administrators of their estates, respectively. The action is based upon a contract made and delivered by the original defendants to the original plaintiff, as follows: "$12,000. Due Peter Mullen or order twelve thousand dollars, bearing seven per cent. per annum interest until paid, in Confederate States seven per cent. bonds, which we or either of us do promise to pay to Peter Mullen, or order, on or before the 1st day of August next, with seven per cent.

interest from date, it being for his stock of cattle which we have purchased from him this day in the following marks and brands " (the contract proceeds with a description of the cattle which are embraced in the sale). " In testimony whereof," etc. Signed and dated the 17th day of June, A. D. 1863. Jury, and verdict for the plaintiffs for the sum of $1,500, and judgment accordingly.

There are several assignments of error; they present under the record before us, however, but one single proposition of law, and that is whether the verdict and judgment is warranted by the evidence and the law applicable to it. The judge who tried the case instructed the jury to find their verdict for the plaintiffs for the sum of $1,500, the parties having agreed that in case the court should hold that the plaintiff is entitled to recover anything on the contract sued on, that there is due on it a balance of $1,500 in United States currency.

The plaintiff introduced the contract sued on in evidence, and the sale of cattle as mentioned in the contract was admitted; that there were delivered by the plaintiff Peter Mullen to the defendants' intestates, not less than one thousand head of cattle of the average value of not less than $3 gold, per head. The other evidence of facts which were also admitted, that are pertinent to the issue, are sufficiently stated in the opinion.

*J. D. Thomas,* for appellants.

*Sayles & Bassett,* for appellee.

WALKER, P. J.— The legal views which took the shape of judicial decisions, in many of the states, after the war, concerning the effect of Confederate money as a consideration in contracts, were discordant and irreconcilable. Many of them long since have been quite exploded; others, being ill supported in principle, failed to command professional respect or other acquiescence than that which was enforced by the power and sanction of judicial authority. It would be tedious and unprofitable to attempt to collect, revise or to

criticise them. Many of them afforded nothing of further interest or significance than the exhibition of gross injustice or ignorance — sometimes of both — promoted by the political passions or interests of the hour, and exhibiting intrinsic evidence of a disregard or else ignorance of the elementary principles which controlled the subject and the rights of the parties.

It is at least known now, and the fact is recognized throughout the land, that not only in the courts of the states which once formed an integral part of the Confederate States, but in the courts of the United States, a contract for the payment of Confederate States treasury notes, made between parties who resided within the Confederacy, can be enforced, the contract having been made on a sale of property in the usual course of trade or business, and not for the purpose of giving currency to the notes or otherwise aiding the rebellion. Thus much, at least, has been decided by the supreme court of the United States. Thorington v. Smith, 8 Wall., 1.

Decisions on this question, previously made in many of the states, seemed to have proceeded upon the fanciful idea that the association of Confederate money, issued to carry on the government at war and in rebellion against the United States, per se tainted the contract with illegality and rendered it therefore invalid. Such a perversion of correct legal distinctions is corrected in the opinion of Chief Justice Chase (Thorington v. Smith); the true criterion for determining the question of illegality being whether the contract was entered into with the actual intent to further insurrection. The illegality does not spring from any contagious property possessed by Confederate money, which infects with disease and taint the contract with which it may be associated, but the contract becomes illegal when its purpose in connection with such a consideration is directed to maintaining the insurrection and accomplishing its objects.

It is indicated in the opinion referred to that the countenance given to such a currency under the circumstances

existing during the war, by the use of it as a medium of exchange in the current affairs of business, whilst it might thereby indirectly and remotely promote the ends of the unlawful government, has no necessary relation to the essential feature of illegality in a contract of that kind, unless it is proved that the contract was "entered into with the actual intent of further insurrection."

The decision in Thorington *v.* Smith was made upon a promissory note payable in Confederate notes; the contract here sued on is payable "in Confederate States seven per cent. bonds," dated 17th day of June, 1863, and given in consideration of a purchase by the makers of a stock of cattle. It was admitted to be true "that the late war or rebellion was flagrant at the time, and that the portion of the state of Texas in which the parties resided, and where the contract was made, to wit, Burleson county, was in the exclusive possession and occupation of the Confederate States, and their forces and adherents; and that the United States government, its forces and adherents, had no possession or occupation thereof, and extended no protection to those sympathizing with them, or adhering to them. That there was no gold or silver coin, or United States notes or currency, in general circulation in that portion of the state at the time, though gold and silver were occasionally used." The courts will take notice, as a matter of notoriety, of the absence of money, other than Confederate bills or notes, during the war. Lumpkin *v.* Murrell, 46 Tex., 52.

There is no evidence in the record to explain more fully the nature of "the Confederate States seven per cent. bonds," contracted to be paid, than is contained in their bare designation as such in the note itself. It is, however, no less a matter of notoriety connected with the history of the times referred to, that there existed Confederate States bonds of that character, in domestic use, and which to a greater or less extent were employed in some of the Confederate States as a currency, and as a representative of values in large financial transactions,— in the purchase and sales of valuable property where large amounts were concerned,—

than that Confederate treasury notes or bills constituted the staple of the currency used by the whole people of the Confederate States as a basis for ordinary transactions.

It is a matter of notoriety that there were during the progress of the war different grades or classifications of Confederate notes, known respectively as the " old " and the " new " issues, with different comparative valuations attached to them.    The fluctuations in the value of these different kinds of government securities, and the great volume of Confederate notes in circulation, together with their rapid depreciation as the war progressed, caused discriminations to be made between them where it was practicable to do so, by those who had occasion from choice or necessity to sell property, especially where the amounts were considerable, and to provide in their contracts that payment should be made in that class or grade of Confederate note or bond, as the case might be, which appeared to them to offer the greater advantage against depreciation, or to afford the surer hope of ultimate payment.    None of them possessed any other than a contingent value; they all rested alike upon the final event of success or defeat of the revolution. Under these circumstances, it seems but a fair interpretation of the facts to consider dealings and transactions between citizens of the Confederate States in respect to their ordinary and current business affairs, where they bought and sold property for Confederate States bonds, and where that selection appears to have been made with reference merely to a preference given to them as a currency over Confederate notes, as coming entirely within the reason and spirit of the decision made in the case of Thorington v. Smith.    In that case, Chief Justice Chase rested his conclusion in respect to the validity of a contract to pay in Confederate notes upon reasoning which may, in this connection, be quoted with advantage, to show its application to Confederate States bonds as well as to Confederate notes.    He said: " It was by this government, exercising its power through an immense territory, that the Confederate notes were issued early in the war, and these notes in a short time became almost exclu-

sively the currency of the insurgent states. As contracts in themselves, except in the contingency of successful revolution, these notes were nullities; for, except in that event, there could be no payer. They bore, indeed, this character upon their face, for they were made payable only 'after the ratification of a treaty of peace between the Confederate States and the United States of America.' While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency imposed on the community by irresistible force.

"It seems to follow, as a necessary consequence from this actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States. Contracts stipulating for payments in this' currency cannot be regarded, for that reason only, as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."

For the explicit reasons thus furnished in that case, we find as little room for doubt in this, that contracts for the payment of Confederate bonds, made under circumstances so analogous to those existing in Thorington v. Smith, should be enforced in the courts of the country to the extent of their just obligation. In both cases the same political and

military supremacy existed; the same dearth and want of a normal standard currency existed in the one case as the other; and in both, the transactions had no necessary relation to the existing and then pending hostility to the United States government, but were transactions "in the ordinary course of civil society," and, as expressed by Chief Justice Chase, "are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection." The nature of these government securities is precisely the same; they were all war obligations, payable only, as the whole world knew, and as they purported on their face, in the event only of a successful termination of the war. The inherent and obnoxious qualities were the same identically in each. The elements which render them available as the subjects of contract consist of two main facts: 1st, that they are in fact placed upon communities as a circulating medium or currency by the dominant government; and 2d, that they are used simply as such by those contracting for them in current trade, and not with an actual intent to further insurrection.

Under such conditions, it is laid down that the contract does not draw after it the illegality which attached to their issuance for an unlawful purpose.

Will it result differently when these same conditions are applied to obligations of like character issued by the government, though differing in form, when such obligations become also the media of exchange and serve the purposes of, and are in fact, a species of currency, provided that contracts made in relation to them are entered into with an intent alike foreign to, and disconnected with, the pending hostilities, but in the ordinary course of trade? We think such a contract is not less "without blame," than that which was so characterized by Chief Justice Chase.

Appellants' counsel in his brief cites the cases of Thorington v. Smith and Hanauer v. Woodruff, 15 Wall., 439, to support the proposition that the principle laid down in the former case, applicable to Confederate notes, does not apply to Confederate States seven per cent. bonds. The latter case

decided that bonds issued by authority of the convention of Arkansas, which attempted to carry that state out of the Union, for the purpose of supporting the war levied by the insurrectionary bodies then controlling that state against the federal government, do not constitute a valid considera- tion for a promissory note, although bonds of that character were used as a circulating medium in Arkansas and about Memphis in the common and ordinary business transactions of the people. The several states which composed the Con- federate States did not undertake in their capacity as such to establish a currency for the people of the Confederate States, nor to control nor direct the affairs of the Confederate States. The congress of the Confederate States and its president directed national affairs under a constitution similar to that of the United States; section 8 of article 1 provided that congress shall have the power " to coin money, and regulate the value thereof and of foreign coin; " section 1, article 1, provided that " no state shall enter into any treaty, alliance or confederation; grant letters of marque and re- prisal; coin money; make anything but gold and silver coin a tender in payment of debts," etc. With limitations like these upon the powers of the states, in respect to providing a currency for the wants of the people, and where that cur- rency, in the shape of Confederate money, or Confederate treasury bills or notes, was actually issued and freely circu- lated throughout the limits of the Confederacy, the presenta- tion of the facts in the case of Hanauer v. Woodruff admitted perhaps of a discrimination — at any rate, such was in fact made — between the validity of one and the other class of securities — state and Confederate. In Thorington v. Smith, the Confederate notes were sustained *as currency;* in the case of Hanauer v. Woodruff, state bonds were repudi- ated as not coming properly within the designation of a forced currency; the court holding that the mere use of them as currency did not constitute them an enforced currency. The court held that the use of such bonds as a circulating medium did not constitute it any more a cur- rency which had been devolved upon the people by the

national power, than though they had been personal obligations of individuals, which may have circulated and derived their negotiability from the confidence reposed in the responsibility of those who had issued them.

In the case of Hanauer *v.* Woodruff, Justice Fields thus concludes his discussion of the question: "In the case at bar, the war bonds issued by the secession ordinance of Arkansas, though used as a circulating medium in that state and about Memphis, did not constitute any forced currency which the people in that state and city were obliged to use. They were only a circulating medium in the sense that any negotiable money instruments, in the payment of which the community has confidence, constitute a circulating medium. The difference between the two cases is the difference between submitting to a force which could not be controlled, and voluntarily aiding to create that force." It deserves to be noticed that in the case from which this quotation is made, Mr. Justice Miller, one of the judges of the same court, took occasion to dissent from the foregoing result, so far as concerned making a discrimination adverse to the contract sued on in the case of Hanauer *v.* Woodruff. He said that, in his opinion, that case came within the principle upon which he had given his assent to the opinion delivered by Chief Justice Chase in the case of Thorington *v.* Smith. He used this language: "But I did assent to it (Thorington *v.* Smith) on the ground that while it was unsupported by, and, in some degree, at variance with the general doctrine of the turpitude of consideration as affecting the validity of contracts, it was necessary to be established as a principle to prevent the grossest injustice in reference to transactions of millions of people for several years in duration. I think the present case comes within that principle."

Justice Miller's opinion in the matter of the Arkansas bonds applies with increased force to the validity of Confederate States seven per cent. bonds.

The Arkansas bonds are stated, in the report of the case, to have been "issued by the authority of the convention which attempted to carry the state of Arkansas out of the

Union by an ordinance of secession; that they were issued for the purpose of supporting the war levied by the insurrectionary bodies then controlling that state against the federal government, and were styled ' war bonds' on their face, and that the purpose of their issue was well known to both plaintiff and defendant; that the bonds received by the defendant were not used, nor intended to be used, by him in direct support of the war, but in the ordinary course of his business; and that bonds of this character were at that time used as a circulating medium in Arkansas and about Memphis, in the common and ordinary business transactions of the people."

Certainly, the Confederate States seven per cent. bonds could not possibly have been more flagrantly obnoxious for illegality than these appear to be on their face; and yet Justice Miller brings contracts founded on these latter within the principle of Thorington v. Smith. In the case before us the evidence does not disclose what was the form or nature or inducement to the issuance of the seven per cent. bonds referred to; and it does not necessarily result that they were more obnoxious than the Confederate notes, nor but that they may have been issued to serve the purpose of a currency for the people in their ordinary transactions of business.

From this review of the two leading cases decided by the supreme court of the United States, we conclude that the consideration of the note sued upon was not an illegal one upon the facts of this case, and that they fully support our conclusion.

It may be questioned, I think, whether the test applied to the subject in Thorington v. Smith is not a more stringent exaction than is warranted on true and correct principle. It would seem to be sufficient, in order to relieve such contracts from having attached to them the consequences of the illegality or vice existing in the obnoxious paper resulting from its illegal origin, that such instruments were bought and sold as commodities in the market in the usual

course of trade, without regard being had by those dealing in them to the existing state of hostilities, and without an intent thereby to promote or advance the overthrow of the government. The illegality does not consist in the mere acquisition, or in the agreement to acquire property or securities of an insurrectionary or revolutionary government; the essence of the illegality consists in an act and an intention connected with such a transaction, to advance and aid the illegal object. But it is deemed altogether sufficient that the consideration in this case is a valid one, tested even by the strictest rule, and one announced by the highest federal authority.

It may even be a question whether the notes and bonds issued by the Confederate States were in fact tainted by the illegality which the current of judicial decision assumes as a starting point. The constitutional and political history of the United States illustrates the fact that none could say, *ex cathedra*, what was the limit of right of a state or states to withdraw from the federal compact; the right to do so peaceably under the constitution was claimed by great deliberative political assemblages, by great statesmen, and by constitutionally organized legislative bodies, running back to very early days of our history, down to the acts of secession. Nothing was more certain than the doubt with which the rights of the states were invested, and that it culminated into extreme partisan advocacy, setting up theories exactly opposite. There was no ultimate arbitrator of the question, and that it was an unascertained problem of political power, an undefined line which separated state from federal sovereignty, was an existing fact, and that insoluble fact was itself part and parcel of our form of government. Whether the one theory or the other was right is not the point. If, however, it were thus an undefined and doubtful right of the states to withdraw, and the people and the states acted upon their convictions of a right to peaceably withdraw, and to form and did form a separate nationality, will such transactions be properly identified and classed with an in-

surrection or rebellion against a government whose form is such that no question is to be made concerning the treasonable character of such acts of rebellion?

If not, then, however false in fact may have been the assumption by the states as to their rights to secede, nevertheless, the sovereign acts of said states, as component parts of a common union, would, under those circumstances, present a case not of rebellion against acknowledged authority in the face of a constitution which defined their duty, but would be the exercise, perhaps wrongfully and erroneously, of a power under a constitution which doubtfully interpreted the limits of that power. The act of secession would not be the act of attempting to overthrow established and acknowledged power and authority — it would not be treasonable nor rebellious. It might be civil war — revolution; but the element of treason and insurrection against constituted authority would be wanting. And, if so, the acts of the government thus organized would not be tainted with treason; its notes and bonds would not be those of mere insurgents.

This view may be suggested in contrast with the extreme views in a precisely opposite direction which have generally assumed, as if not to be questioned, that the paper money and bonds issued by the Confederate States were utterly illegal and founded and based in treason. If they were not thus illegal when issued, they do not become so retroactively by means of the defeat of the Confederate cause. To so hold would be to create an offense *ex post facto* by a species of judicial confiscation.

We conclude that the judgment of the court was correct; we conceive it to be well supported on elementary principles applicable to the question, as well as by the authority of the cases to which we have referred, and to some extent discussed in this opinion. We determine, therefore, that the judgment should be in all things affirmed.

AFFIRMED.