Nott, Ch. J.,
delivered the opinion of the court:
In January, 1882, the officer in command of the Benicia Arsenal received a communication from the assistant adjutant-general at the headquarters of the Military Division of the Pacific, which said: “The division commander directs me to enclose herewith for your information a copy of a ‘memorandum of opinions upon target practice and in regard to the Springfield rifle and carbine.’ ” The communication was signed “J. 0. Kelton, Assistant Adjutant-General.” It enclosed a printed circular signed “ J. 0. Kelton, Colonel, A. A. G-.,” purporting to be issued by “ direction of the division commander,” in regard to proposed changes in small arms. The circular was accompanied by a plate or drawing of the proposed changes, and, among other things, said: “If these wants are generally felt by company cavalry officers, they should, if they adopt the devices proposed, or present better, make known their wishes to the commanding officer, Benicia Arsenal, through their department commander.” To the plate was attached a memorandum entitled “Memorandum of views entertained in respect to inexpensive modifications in the Springfield rifle and carbine, perfection consisting in the sum of small improvements.” It referred to a number of changes and improvements in small arms and, among others, to a front-sight cover for rifles and carbines, which device, as afterwards modified and patented, is the subject of the present action.
*340 The commanding officer of tbe arsenal wrote in reply, requesting “to be informed whether the division commander desired him to forward these enclosures to the Chief of Ordnance.” Other communications followed during the year 1882 which were less formal and more personal, and referred to the changes in small arms as “his” (Ool. Kelton’s) “proposed devices.” The tone of the communications chahged, but they always remained official — communications between the adjutant-general of the Military Division of the Pacific and an ordnance officer.
The commanding officer of the arsenal forwarded the communication and memorandum setting forth the- proposed changes to the Chief of Ordnance at Washin gton, an d requested authority “to comply with the desire of the division commander.” TheChief ofOrdnance referred them to thecounnand-ing officer of the national armory at Springfield for examination and report; a board reported favorably; the Springfield Arsenal, with modifications and changes, manufactured or made sample sights; the Chief of Ordnance examined the sample sights and forwarded them to the Benicia Arsenal, “with authority to comply with the wishes of Col. Kelton and division cominauder as far as funds may permit.”
At a later day, August 10th, 1882, Ool. Kelton, referring to one of his proi>osed improvements, “ an experimental magazine rifle,” proposed to bear the expense of it, and the commanding officer of the Springfield Arsenal called attention to the Act 3rd March, 1875 (18 Stat. -L., 452, 455,- § J), which provides “that hereafter no money shall be expended at said armories in the perfection of patentable inventions in the manufacture of arms by officers of the Army.” The Chief of Ordnance authorized this experimental rifle to be made at Col. Kelton’s cost, but the expense of the front-sight covers was borne by the Government.
On the 31st October, 1882, the Chief of Ordnance. directed the commanding officer of the Benicia Arsenal “ to confer with Col. Kelton and furnish the Bureau with such information as may aid it in coming to some definite conclusion as to the number, if any, of these front-sight covers to be issued to the Army.” On the 22d December, 1882, Colonel Kelton said that he did “not think 10,000 too many to have made; ” and on the 16th January, 1883, the Chief of Ordnance directed that 3,000 *341 be made and sent to tbe Benicia Arsenal for issue ; and on tbe 22d January, 1883, be further directed that tbe front-sight covers should be made like “ tbe sample furnished from tbe Armory, which Col. Kelton calls tbe ordnance device — tbe one approved by him” — that is to say, like tbe tracing shown in tbe armory letter, but changed at tbe suggestion of Colonel Kelton with regard to tbe elevation of tbe front sight.
On tbe 16th June following Colonel Kelton applied for a patent.
Tbe question which these facts present is whether tbe claimant can maintain an action against tbe Government for tbe use of bis alleged patented invention.
Tbe counsel for tbe defendants contends that tbe device which Colonel Kelton brought in January, 1882, to tbe attention of tbe ordnance officers was not a fully completed invention. “ Tbe development of that suggestion, up to tbe moment when tbe Government sight cover existed as an operative device, was solely at the cost and risk of tbe Government. This being so, and Col. Kelton being an army officer, tbe case clearly comes in tbe recent decision in Gill v. United States (160 U. S., 426).” Tbe counsel for tbe claimant replies that the facts in Gill’s Case “ bear no possible or conceivable resemblance to those presented in tbe case at bar ; ” that Colonel Kelton did not take advantage of bis connection with tbe Government; that bis duties as Adjutant-General in no way related to tbe manufacture, adoption, or issuance of ordnance; that bis invention was not introduced or bis sight covers issued for service until after be bad applied for a patent; that be never received increased pay or preferment on account of bis invention, and that be notified tbe Ordnance Department that bis invention was bis property, and acted in accordance with tbe usage and custom prevailing in tbe Ordnance Department governing tbe adoption of patented inventions.
Tbe last position does not seem to tbe court to be sustained by tbe evidence. If there was any such notification, it has not been shown or must be a matter of inference from tbe communications set forth in tbe findings.
McKeever’s (14 C. Cls. R., 396) is tbe leading case of actions brought on implied contracts to recover for tbe use of an invention — tbe first case where an inventor recovered for what, as . between individuals, would be an infringement of bis *342 patented device — without there being an express contract as the foundation of the action. The claimant there was also an officer of the Army, and his invention was for a military accouterment, but he did not act until his patent had been issued, and he then addressed a written communication to the Ordnance Office, in which he expressly stated that the device was patented. The Chief of Ordnance acknowledged the receiptofthe “sample boxes” as “your patent cartridge boxes,” and the board which recommended their adoption described them as “ the cartridge box invented by Lieutenant McKeever.” In this case there was no such notification on the part of the inventor and no such acknowledgment of an understanding-on the part of the Ordnance Office. Some of the front sights were manufactured, or in process of manufacture, before an application for a patent had been filed; some were manufactured after the application, but before the patent was issued. What proportion has since been manufactured does not appear.
Colonel Kelton, as “Assistant Adjutant-General,” was consulted and deferred to as to the number which should be manufactured, and the communications from him were always signed as assistant adjutant-general. It is true, as has been said before, that the tone of the communications changed; and it is probable that the officers of the Army knew of so prominent an officer as Colonel Kelton, that he was interesting himself in the improvement of small arms; but when, in his first communication to the commanding officer of the Benicia Arsenal, Colonel Kelton wrote, “The division commander directs me to enclose herewith for your information a copy of a memorandum,” and signed that communication “ J. C. Kelton, Assistant Adjutant-General,” he stamped everything which followed as official. The orders and communications of a commanding officer ordinarily emanate from headquarters in the name of his adjutant-general; and in military usage the official orders and communications issued from tlie headquarters by the adjutant-general are the orders and communications of. the commanding officer. If Colonel Kelton had waited until his patent ivas issued, had borne all the expense of completing the invention without aid from the Ordnance Department, and had laid his invention before the proper officers of the United States with the express declaration that it was patented by him, the case would be like McKeever’s. But these three ele *343 ments are wholly wanting in this case. It is not in those particulars like McKeever’s, and the question is whether it comes within the decisions in the cases of Solomons and Gill (21 C. Cls. R., 479; 137 U. S., 342; and 25 C. Cls. R., 415; 160 U. S., 426).
The differences between these two cases were these:
In Solomons’s the invention was by an officer of the Government charged with the duty of selecting and manufacturing an internal-revenue stamp; he was one of a committee who selected the stamp; he concealed from the committee the fact that the stamp which he produced and laid before them was his own invention, that it was patentable, and that he intended to patent it; he used the means and appliances of the Government and of the Bureau of which he was a chief, though trivial, to complete and perfect his invention, and he took out his patent as inventor while engaged in the manufacture of the stamp as an officer of the Government.
• In Gill’s Case the claimant was not a public officer, but a simple mechanic on daily wages, holding a subordinate position, and not charged with the duty of making inventions or perfecting machinery. He carried his device to the commanding officer when he had completed it, informing him that it was his own; and he had received no assistance from the Government in money, material, or the services of other employes, when the commanding officer approved the device and ordered the construction of a machine. But he allowed that machine and others to be built without notice bo the commanding officer that he intended to patent his device and should ultimately claim a royalty.
The present case differs from the other two in this: Colonel Kelton was not an officer in the Ordnance Department; he was not charged with the duty of selecting arms; he was not employed in their manufacture, and his device, if adopted by officers charged with that responsibility, could be beneficial to himself in but one way, by enabling him as inventor to receive a royalty.
In the implied-license cases which have come before the Supreme Court there has been the element of employer and employé. The time which was given to the invention was more or less the employer’s time; the money paid for completing and developing and perfecting it was the employer’s money. These *344 things the courts have deemed sufficient to constitute a valid consideration for a license. In the first, the leading, case of McClurg v. Kingsland (1 How. R., 202), the so-called invention was but a crude idea; it could not be said to be useful until it was tested; the inventor received wages for working on what might be termed his own working model, and his wages were raised in consequence of the useful i esult obtained after several unsuccessful experiments. In Gill’s Case (160 U. S., 456) this consideration was of the narrowest. For it appeared by the findings that “ the claimant was not employed to make inventions or assigned to that duty, and his invention, until it was reduced to paper in the form of an intelligible drawing, was made out of the hours of labor at the arsenal and during the time which was properly his own, and the work of so devising a machine was not an obligation imposed upon him by the authorities of the arsenal.” It also appeared by the findings that “'from time to time his wages were advanced, until they became in 1881 $6 a day, and he was in 1881 appointed master armorer;” but that “ this increase of pay and advancement of position came through and by authority of the commanding officers of the arsenal, and the consideration or reason therefor was that the claimant was a faithful, intelligent, and capable employee, whose services were of great value to the Government.” It also appeared that “it was never stipulated by any commanding officer, or understood or agreed to by the claimant, that the advance of wages was to be a consideration for the use of his inventions.” The counsel for the claimant contends that the present case does not come within the general rule of the others, inasmuch as here there was no such consideration. Colonel Kelton was not an officer or employé of the Ordnance Department; neither his pay nor his preferment depended upon services rendered there; when his duties as adjutant-general were performed, his time was his own, and under the decision of the Supreme Court in Burn’s Case (12 Wall., 246) he had a right to make a military invention, and that invention, when patented, was his own property, vendible, like other property, to the Government.
The present case may not come withiu the letter of the decision of the Supreme Court in Gill’s Case, but it does come within the decision announced by this court.
*345 When that case was under advisement, it was perceived that the Government had made use of the claimant’s invention of a cartridge-loading machine by making and operating at various times, running through a course of several years, nine distinct and separate machines. Some had been built under one commanding officer and some under another. Their operation did not depend upon each, other nor preclude the Government from making cartridges with the old machines which these superseded. The old machines and the new machines had run side by side, and the cartridges which they filled were to all intents and purposes an identical product. Of these nine machines it remains to be said that eight of them were built and operated before a patent was taken out and that one of them was built after the patent had been issued.
An implied license can not be deemed to cover mo e than an express license given in like circumstances ami under like conditions. A license to do one thing is not a license to also do several things. A license to a steamship company to use a patented screw in one ship would never be construed to be a license to put a screw in every ship of the line and in ships subsequently constructed during the life of the patent. Where there is a necessary continuity in the use of the invention, the implied license necessarily extends as far as the user. Thus, in the case of McClurg v. Kingsland the invention consisted not in a machine for effecting a process, but for the process itself — a method for introducing molten metal into the mold at a certain angle.
In such a case the manufacturer could not be asked to tear his works to pieces and go back to the old method after his employee had taken out a patent and acquired a property in the invention. So in the case of Lane Bodley Co. v. Locke (150 U. S., 193), the employee had invented a stop valve, which thefirm, with his consent, introduced into the elevators which they built. The device became a part of the machines which they manufactured and advertised and sold. It was, as it were, covered by their trade-mark. After the employee left their service, he could not ask them to undo their established business and make elevators of a different design. The text-books make the distinction under the terms of “business,” “process,” and “machine.” “If,” says Robinson (2nd Robinson *346 on Patents, 637, § 832, note 4), “the workman, by using the tools and time and money of his employer with his consent, makes an invention and applies it in his employer’s business, the employer may continue to use it. If the improvement is a process, it has been held that the employer may continue to practise the process for the whole period of the patent. (McClurg v. Kingsland, 1 How., 202; Chabot v. American Buttonhole, &c., Co., 6 Fisher, 71.) But if the invention pertains to a machine, it is understood that only the specific machine or machines which have been so made are licensed. (Pierson v. Eagle Screw Co., 3 Story, 402; Brickill v. Mayor of New York, 7 Fed. Rep., 479.) Further, where a workman makes an invention at the expense of his employer, and applies the invention practically in the employer’s business, the employer has an implied license to use it after the relation ceases. See Jencks v. Langdon Mills (1886), 27 Fed. Rep., 622; 36 O. G., 347; Bensley v. Northwestern Horse Nail Co. (1886), 26 Fed. Rep., 250; 36 O. G., 689; Barry v. Crane Bros. Mfg. Co. (1884), 22 Fed. Rep., 396; Slemmer's Appeal (1868), 58 Pa. St., 155.” If the case of Gill had been an ordinary action for infringement between ordinary parties, the court entertained no doubt then, and entertains no doubt now, that the plaintiff would have been allowed to recover for the infringement of his patent by the building and user of the ninth machine.
But the case of Gill was not an action for an infringement — • that is to say, it was not an action under the patent laws, ex delicto in its nature. As was then said: “In these cases against the Government the element of contract comes in and the element of tort must be excluded. It is as if the parties had expressly agreed that the taking of the property should not be deemed tortious, and that where the validity of the patent is attacked the defense should come in as if the suit were on an express contract with a warranty, and the defendant were setting up a failure of consideration. Accordingly, if the facts are such that a contract may be implied in these cases, the law will imply one; but the law will not treat the user as if it were an infringement.” Our jurisdiction, it was also said, is substantially that of the State courts, amplified by jurisdiction of cases of implied contract.
The resulting question in Gill’s Case, then, was whether the contract was one which could be enforced.
*347 The principle, too often overlooked in modern jurisprudence, is that courts are not established and maintained to give effect to contracts which should not have been made. It is not every suit that will be entertained, for the reason that the cause of action is not prohibited by law. There was no statute against exchanging horses for barley in the old case of James v. Morgan (1 Living. R., 111), where the purchaser agreed to give one barleycorn for the first nail in the horse’s shoe, two for the second, four for the third, and so on, in geometrical proportion, until the value of the barley, which was the price, amounted to about £400. There was no fraud in the case of Sume v. United States (132 U. S., 406), where the defendants agreed to pay $60 per hundred for shucks which were worth about 60 cents. In Hanauer v. Woodruff (15 Wall., 439) the case was the ordinary one of one man selling goods to another and subsequently bringing a suit for the purchase money. But it appeared that the property was sold to a Confederate contractor for use in the Confederate army, and that the object of the purchase was known to the vendor.- There was no State statute which forbade such sales; there was no United States statute which reached the case. But the Supreme Court said of it, “When a contract is connected by its consideration with an illegal transaction, a court of justice will not aid its enforcement.” The case of Groton v. The Inhabitants of Waldoborough (2 Fairfield R., 306) is a monumental record of rural thrift. A town put up the office of constable at auction. The plaintiff for three years bid it off, and was three times duly elected, and paid the purchase money. The sum total of his three investments in the office was $33.29. Much might be said,' plausibly, in support of the transaction. It was not the case of an individual selling a public office for his private gain. The transaction was public, and believed to be for the public good — the diminution of taxation. It tended to exterminate the pest of the professional office seeker; it forestalled the secret combinations and machinations of the political caucus. There was no statute forbidding a community to dispose of their offices just as other communities are often required to dispose of their franchises. Moreover, no small part of the legislative power is vested in the New England towns, and in matters which strictly concern themselves they have an almost prescriptive right to regulate their own affairs *348 in their own way. Nevertheless, the Supreme Court of Maine held that the transaction was prejudicial to the public welfare; that such officers might reimburse themselves by oppression and extortion; that “men of elevated minds and correct principles could never be reconciled to this mode of obtaining' office,” and that the court, for reasons of public policy, should not extend its assistance to either party. Contracts which are against public policy, contracts which involve moral turpitude, contracts which are against public morals or decency, were not prohibited by early English statutes, but when parties to such transactions sought judicial redress, the courts of the common law interposed on their own authority and said— and would have said, though the point had not been raised by the defendants — it is not the office of courts of justice to aid parties in the enforcement of such contracts.
A guardian or trustee can not- sell to himself. Such sales are not prohibited by positive enactment, and they may not be ipso facto absolutely void at law, but they are always “ viewed with suspicion; ” and it requires so little more than suspicion to void such transactions that it may be said that courts of equity always set them aside for the asking. It is not a question of fraud, or dishonesty, or unfairness, or undue influence in the particular case before the court. It is as was said by Lord Hardwick (2 Ves., 548, 549): “All depends upon public utility, and therefore the court will not suffer it, though, perhaps, in a particular instance there may not be an actual unfairness.” It is as Story states it (Eq. Juris., § 322): “The principle applies, however innocent the .purchase may be in the given case. It is poisonous in its consequences.”
In this court public officers have always been regarded as guardians of the public welfare, and the Government as a ward which is always under the protection of the court. In the case of Solomons, where there was a responsible public officer and a personal responsibility and discretion vested in him, the court applied that principle to the case without hesitation. In the case of Gill, where the inventor was a simple mechanic, working in an arsenal at $4 a day and charged with no personal responsibility and invested with no discretionary power, the court applied the principle with some doubt and with extreme reluctance. In this case, where the inventor was the adjutant-general of a military division, bringing his invention to the notice of the Ordnance Department through *349 tbe interposition of bis commanding officer, using tbe time and skill and experience of Government officers and experts and its machinery and appliances to perfect bis invention, and introducing tbe device into tbe service before it was patented, tbe court can perceive no difference between it and tbe two other cases on which to found a legal distinction. Tbe invention was brought to tbe attention of tbe ordnance officers by virtue of Colonel Kelton’s official position, and they consulted and deferred to him in regard to tbe number which should be manufactured at tbe outset. He could not, at one and tbe same time, be tbe adjutant-general of a military department determining tbe number of tbe sights which should be manufactured for issue and use, and tbe inventor claiming a royalty for the device. If Colonel Kelton intended to sell his device to tbe Government when be invented it, the way was open to him" as it bad been open to the officers in McKe&oer’s and Palmer’s cases (14 C. Cls. R., 396; 20 id., 432; 128 U. S., 269). It was for him to perfect tbe invention by his own means and appliances, to transmute it into property by obtaining for it a patent right, and to offer that property as property — i. e., as a patented device to tbe officers of tbe Government charged with the official responsibility of improving and manufacturing arms. Tbe case does not possess these requisites.
Inasmuch as it is now decided that there was no sale and purchase between tbe parties, tbe court does not feel at liberty to pass upon any question affecting tbe validity of tbe. patent or in giving a construction to its terms.
The judgment of tbe court is that tbe petition be dismissed.